# Supreme Court of Texas

No. 21-0080

Glenn Hegar, Comptroller of Public Accounts of the State of
Texas, and Ken Paxton, Attorney General of the State of Texas,

*Petitioners*,

v.

Health Care Service Corporation,

*Respondent*

On Petition for Review from the
Court of Appeals for the Third District of Texas

**Argued February 3, 2022**

JUSTICE BLAND delivered the opinion of the Court, in which Chief Justice Hecht, Justice Lehrmann, Justice Boyd, and Justice Huddle joined.

JUSTICE BLACKLOCK filed a dissenting opinion, in which Justice Devine, Justice Busby, and Justice Young joined.

Employers who self-fund health insurance for their employees often purchase "stop-loss" policies that reimburse the employer when the employer's self-insured health-care costs exceed individual or aggregate thresholds. The question before us today is whether the

Comptroller properly taxed an insurer based on premiums it received from sales of these stop-loss policies, under Insurance Code Chapters 222 and 257. Because the governing statutes unambiguously impose these taxes on the insurer's premiums, we hold that the Comptroller properly assessed them.

## I

Health Care Service Corporation does business as Blue Cross Blue Shield, a household-name insurance carrier in Texas. The Texas Department of Insurance approved Blue Cross to sell stop-loss policies to employers who self-fund their employees' health insurance. The Blue Cross policies indemnify the policyholder for amounts paid to reimburse health-care claims above a specific threshold, called the "Point of Attachment." Blue Cross's standard policy provides coverage for both individual and aggregate points of attachment. This means that Blue Cross reimburses its policyholders when health-care costs exceed the point of attachment for any covered individual and for the covered population. For example, if the individual point of attachment is $35,000 and an employee incurs $500,000 in health-care costs during the policy period, then Blue Cross reimburses the employer $465,000. If the aggregate point of attachment is $1 million, and the covered individuals collectively incur $1.5 million in health-care costs, Blue Cross reimburses the employer $500,000.[1]

In calendar year 2012, the period at issue, Blue Cross received over $7 billion in Texas insurance premiums, including $171.6 million

---

[1] Blue Cross provided these example figures in its motion for summary judgment.

2

in premiums from stop-loss policies. With respect to the stop-loss premiums, Blue Cross paid $3,005,270.13 in premium taxes and $68,691.89 in maintenance taxes—less than 2% of those sales.

The source of the Comptroller's authority to collect premium taxes is Chapter 222 of the Insurance Code. Chapter 222 imposes an annual tax on premiums received "from any kind of . . . insurance policy or contract covering risks on individuals or groups" arising from the business of health insurance:

> Except as otherwise provided by this section, in determining an insurer's taxable gross premiums or a health maintenance organization's taxable gross revenues, the insurer or health maintenance organization shall include the total gross amounts of premiums, membership fees, assessments, dues, revenues, and other considerations received by the insurer or health maintenance organization in a calendar year from any kind of health maintenance organization certificate or contract or insurance policy or contract covering risks on individuals or groups located in this state and arising from the business of a health maintenance organization or the business of life insurance, accident insurance, health insurance, life and accident insurance, life and health insurance, health and accident insurance, life, health, and accident insurance, including variable life insurance, credit life insurance, and credit accident and health insurance for profit or otherwise or for mutual benefit or protection.[2]

The premium tax rate is fixed by statute at 1.75%.[3]

The source of the Comptroller's authority to collect maintenance taxes is Chapter 257 of the Insurance Code. Chapter 257 provides that

---

[2] Tex. Ins. Code § 222.002(b).

[3] *Id.* § 222.003(a).

"[a]n insurer shall pay maintenance taxes under this chapter on the correctly reported . . . gross premiums collected from writing life, health, and accident insurance in this state."[4] The maintenance-tax rate varies annually and is intended to generate "the amount the commissioner determines is necessary to pay the expenses during the succeeding year of regulating life, health, and accident insurers."[5]

In this suit, Blue Cross seeks a refund of its 2012 premium and maintenance taxes collected from its stop-loss policies, principally arguing that its stop-loss policies do not cover risks on "individuals or groups" and are not "health insurance."

Blue Cross and the Comptroller filed cross-motions for summary judgment. The trial court ruled for Blue Cross, and the court of appeals affirmed.[6] The court of appeals concluded that "[s]top-loss insurance touches on and involves a group policy but does not cover risks to the individual members of the group," reading the policies to cover "the *employer's* risk, providing a cap for the *employer's costs* in paying for its employees' medical care."[7] Referencing "an ancient pro-taxpayer presumption,"[8] the court of appeals "strictly construe[d] the language of section 222.002(b) against taxation" and held that Blue Cross does not

---

[4] *Id.* § 257.003.

[5] *Id.* § 257.002(b).

[6] __ S.W.3d __, 2020 WL 7294614, at *11 (Tex. App.—Austin Dec. 11, 2020).

[7] *Id.* at *5.

[8] *Id.* at *2 (quoting *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 182 (Tex. 2013)).

4

owe taxes on stop-loss premiums.[9] The court similarly held the maintenance tax inapplicable because the stop-loss policies "protect an employer from risk incurred from deciding to pay its employees' healthcare costs," and that Blue Cross did not collect the premiums from writing health insurance.[10] Finally, the court of appeals determined that Blue Cross presented sufficient evidence to support the amount of its refund claim.[11]

We granted the Comptroller's petition for review.

## II

The burden of proving entitlement to a tax refund lies with the taxpayer.[12] When the material facts are undisputed, we interpret the statute de novo.[13]

As in any statutory interpretation case, "[o]ur objective is to ascertain and give effect to the Legislature's intent."[14] In doing so, we enforce the plain meaning of statutory text, informed by its context.[15] Words that in isolation are amenable to two textually permissible

---

[9] *Id.* at \*5.

[10] *Id.* at \*6.

[11] *Id.* at \*11. The Comptroller does not challenge this portion of the court of appeals' opinion.

[12] *Lockheed Martin Corp. v. Hegar*, 601 S.W.3d 769, 774 (Tex. 2020).

[13] *Id.*

[14] *In re D.S.*, 602 S.W.3d 504, 514 (Tex. 2020).

[15] *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 133 (Tex. 2019).

interpretations are often not ambiguous in context.[16] As we observed in another tax case: "If an undefined term has multiple common meanings, it is not necessarily ambiguous; rather, we will apply the definition most consistent with the context of the statutory scheme."[17] Further, our inquiry is not whether the statute has an ambiguous scope, but whether the language itself is ambiguous.[18] If the language of the statute proves ambiguous, however, we apply the presumption in favor of the taxpayer.[19]

As a threshold matter, Chapter 222 applies to premiums received from "any kind of . . . insurance policy or contract covering risks on individuals or groups."[20] The statute instructs the reader not to be misled by distinctions of kind; premiums from *any kind of* policy or

---

[16] *See id.* at 135 (resolving the meaning of the phrase "good, product, or service in the marketplace" in the Texas Citizens Participation Act by preferring the interpretation that "comports with the text's context within the statute's explanation of the well-worn phrase 'matter of public concern'").

[17] *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 405–06 (Tex. 2016) (employing the rule against surplusage to interpret "processing" and concluding tax statute was unambiguous).

[18] *Id.* at 406.

[19] *TracFone Wireless*, 397 S.W.3d at 182 ("The reach of an ambiguous tax statute must be construed 'strictly against the taxing authority and liberally for the taxpayer.'" (quoting *Morris v. Hous. Indep. Sch. Dist.*, 388 S.W.3d 310, 313 (Tex. 2012))). Canons that express policy preferences (such as construing contracts against drafters, or the presumption in favor of the taxpayer) only come into play after a determination that the text is ambiguous—in other words, such preferences cannot themselves create ambiguity.

[20] Tex. Ins. Code § 222.002(b).

contract are taxable, so long as the policy "cover[s] risks on individuals or groups" and "aris[es] from the business of . . . health insurance . . . ."[21]

The ellipses hide the robustness of the statute. The premium tax applies not just to the business of health insurance, but also to life insurance, accident insurance, and to every possible combination thereof: "life and accident insurance, life and health insurance, health and accident insurance, life, health, and accident insurance."[22] This thoroughness is mirrored in the listing of types of taxable income: "premiums, membership fees, assessments, dues, revenues, and other considerations."[23] Nothing about Chapter 222 is narrowly tailored or exacting. Rather, the statute employs language to maximize its applicability.

With this context established, we turn to the contested components of the premium tax the Comptroller assessed in this case: first, whether the Blue Cross stop-loss policies cover "risks on individuals or groups," and second, whether the premiums Blue Cross collected arose from "the business of . . . health insurance."[24]

## A

Blue Cross interprets "individuals" to mean natural persons and "groups" to mean multiple natural persons, and it argues that a self-insured employer is neither. It argues that stop-loss policies "cover the risks on a juridical entity: an employer and its self-funded health

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

benefit plan," and thus the policies do not cover risks on natural persons or groups of natural persons. To support its position, Blue Cross points to insurance industry descriptions of stop-loss policies as "third-party" coverage that "insure[] only the employer."

The Comptroller responds that the Blue Cross policies *cover risks* on individuals and groups because the policies reimburse health-care claims above individual and aggregate attachment points, which directly ties reimbursement to the payment of individual and group health-care claims. In addition, the surrounding statutory provisions show that the Legislature contemplated that sales of stop-loss policies be subject to the premium tax.

We agree with the Comptroller. The Blue Cross stop-loss policies cover risks on both individuals and groups. The policies provide coverage when any individual's health-care costs exceed the individual point of attachment as well as when all covered individuals' health-care costs exceed the aggregate point of attachment. Insurance policies are a hedge against risk. Here, the particular risk hedged against is an uncertainty that lies on people and their health care—the risk that the individuals will either collectively or individually incur health-care costs above a particular amount that the self-funded plan is obligated to pay. That a corporate entity is the one paying a premium to offset this risk is irrelevant; nothing in Section 222.002(b) concerns the identity of the ultimate payor. The stop-loss policies are among "any kind of" policy

"covering risks on individuals or groups," which is all the statute requires.[25]

Relying in part on the doctrine that courts strictly construe taxing statutes against the taxing authority, the court of appeals conflated the statutory "risks *on* individuals or groups" with "risks *to* the individual members of [a] group."[26] The text does not supply such a limitation, and the presumption in favor of the taxpayer cannot either. The presumption in favor of the taxpayer, though ancient, is a rule of last resort—a feather to tip the scale between equally plausible interpretations.[27] Blue Cross indemnifies the employer against excess individual or aggregate health-care costs that it incurs during the coverage period—costs that self-insured employers are obligated to fund. Because the statute is not ambiguous, the presumption is not implicated here.

If there remains any doubt about whether stop-loss policy premiums are taxable, the statutory context resolves it. First, the statute identifies stop-loss policies issued to health maintenance organizations as "reinsurance" that is explicitly exempted from the

---

[25] *Id.* Like the court of appeals, the dissent differentiates between health-care risks and financial risks associated with paying for health care, but in this instance, they are one and the same. "Direct" health insurance does not provide health care: it reimburses the payor for the cost of health care. The stop-loss policies similarly cover the costs of health care above a certain threshold by reimbursing the self-funded payor for those costs; these policies do not cover market risks, interest-rate risks, or some other financial risk.

[26] *Compare* Tex. Ins. Code § 222.002(b) (emphasis added), *with* 2020 WL 7294614, at *5 (emphasis added).

[27] *See TracFone Wireless*, 397 S.W.3d at 183 ("[W]e will not extend the reach of an ambiguous tax by implication, nor permit tax collectors to stretch the scope of taxation beyond its clear bounds.").

tax.[28] "When specific exclusions or exceptions to a statute are stated by the Legislature, the intent is usually clear that no others shall apply."[29] The HMO exemption bolsters the interpretation that Chapter 222 otherwise covers stop-loss premiums earned from non-HMO policies. The exemption does not "extend the reach of an ambiguous tax by implication" but instead makes clear that the Blue Cross policies fall within "any kind" of policy or contract and that premiums earned from sales of such policies are taxable.[30]

Blue Cross argues that the exception should carry no interpretive weight because it is vestigial. Before 2007, the statute taxed policies received from premiums "covering a person."[31] The Legislature amended the statute in 2007, however, broadening its scope from "covering a person" to "covering risks on individuals or groups." Blue Cross argues that the Legislature implicitly repealed its tax on stop-loss policies at that point but declined to strike a now-ineffective exemption for HMOs, perhaps, it suggests, for reasons of political expediency.

---

[28] Tex. Ins. Code. § 222.002(c)–(d).

[29] *Unigard Sec. Ins. Co. v. Schaefer*, 572 S.W.2d 303, 307 (Tex. 1978) (refusing to recognize unenumerated exception for unauthorized drivers in statute requiring personal-injury protection coverage in automobile liability insurance policies).

[30] *See TracFone Wireless*, 397 S.W.3d at 183.

[31] *See* Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 1, 2003 Tex. Gen. Laws 3611, 3621 (codified at Tex. Ins. Code § 222.002(b)).

Repeals by implication are disfavored.[32] In this case, there is no compelling textual reason to conclude that the 2007 amendment was a repeal.[33] The change from "covering a person" to "covering risks on individuals or groups" merely clarifies that the tax applies to group insurance, not just individually negotiated policies. We decline to adopt Blue Cross's speculative reason for according the statutory exemption no weight.

Even if we accepted Blue Cross's argument that the risk covered by stop-loss policies is not a hedge against the risk on the uncertainty of individual health-care costs, we would still conclude that an employer is a "group" for the purposes of the taxation statute. The strongest evidence that a single entity covering individuals qualifies as a "group" for the purposes of the statute is the use of "group" in Section 222.002(c)(5) to describe a single insured:

> (c) The following are not included in determining an insurer's taxable gross premiums or a health maintenance organization's taxable gross revenues:
>
> . . . .

---

[32] *Kroger Co. v. Keng*, 23 S.W.3d 347, 351 (Tex. 2000); *Gordon v. Lake*, 356 S.W.2d 138, 139 (Tex. 1962).

[33] The dissent suggests that, with the 2007 amendment, the Legislature may have narrowed the tax inadvertently. *Post* at 8 (Blacklock, J., dissenting). We presume, however, that the Legislature acted deliberately, and that it did so consistently with its preservation of the statutory exemptions. *See Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010) ("We presume the Legislature selected language in a statute with care and that every word or phrase was used with a purpose in mind."). The change to "covering risks on individuals or groups" was the only change made to Chapter 222. *See* Act of May 28, 2007, 80th Leg., R.S., ch. 932, § 2, 2007 Tex. Gen. Laws 3194, 3195. The text is more reasonably read to broaden the kinds of risks a given policy may cover, not narrow them.

(5) premiums or revenues paid on group health, accident, and life polices or contracts in which *the group* covered by the policy or contract *consists of a single nonprofit trust* established to provide coverage primarily for employees of [certain governmental entities].[34]

If a "single nonprofit trust" is a "group" otherwise subject to the tax, so too is an employer. As we have recognized, "when a word is used throughout a statute, we generally construe the statute to provide consistent meaning to that word."[35]

The dissent finds the canon of consistent usage "unconvincing" because a trust purchasing group coverage "bears no resemblance" to a self-insured corporation.[36] The point, however, is that the Legislature considered such trusts—single, juridical entities, in Blue Cross's parlance—to be "groups" that, absent the statutory exception, would otherwise fall within the ambit of Section 222.002(b). Absent the statutory exception, a policy premium paid by such a trust is taxable because the trust qualifies as a "group" under Section 222.002(b), even though the risks are on an entity, not on individual natural persons.[37]

---

[34] Tex. Ins. Code § 222.002(c) (emphases added).

[35] *Beeman v. Livingston*, 468 S.W.3d 534, 539 (Tex. 2015).

[36] *Post* at 12 (Blacklock, J., dissenting).

[37] *See, e.g.*, Tex. Loc. Gov't Code § 157.101(b) ("The commissioners court may provide [group health and related benefits] through insurance, self-insurance, or a contract with a county-operated hospital, a hospital operated jointly by a municipality and county, or a private hospital."); *id.* § 157.102(a) ("The commissioners court may establish a fund to pay for the group health and related benefits. The fund may take the form of a single nonprofit trust as described by Section 222.002(c)(5)(A), Insurance Code.").

We hold that Blue Cross's stop-loss policies cover risks on individuals or groups, and thus the premiums Blue Cross collected are taxable under Chapter 222 if they arise from the business of health insurance.

## B

The second component of the premium tax that Blue Cross challenges is whether the stop-loss policies "aris[e] from the business of . . . health insurance."[38] Blue Cross argues that stop-loss policies are not health insurance under Insurance Code Chapter 1201, which defines and regulates "health insurance" in the insurance context. The taxing statute, however, does not require that stop-loss policies *be* health insurance, so long as the policies "aris[e] from" the business of health insurance. Chapter 222 taxes a broader array of policies than those Chapter 1201 regulates.

Blue Cross further argues that "the Comptroller fails to establish any connection between stop-loss policies in general and health insurance." Such a connection, however, is present. Blue Cross sells stop-loss insurance to limit employer liability when their employees' health-care costs exceed certain thresholds. The example policy in the record indemnifies the policyholder for "the amount paid pursuant to the [self-funded Group Health Plan of the Policyholder] . . . in excess of the Point of Attachment specified." Because such payments directly relate to the obligation to provide health-care coverage above certain

---

[38] Tex. Ins. Code § 222.002(b).

13

thresholds, we conclude that Blue Cross's receipt of premiums for these policies arises from "the business of . . . health insurance."

## III

We next turn to the maintenance tax, imposed on premiums "collected from writing life, health, and accident insurance in this state."[39]

The Comptroller argues that the policies fall within Chapter 257 because stop-loss policies reimburse employers for medical expenses, which Blue Cross is obligated to pay by indemnifying the policyholder for "the amount paid pursuant to the [self-funded Group Health Plan of the Policyholder] . . . in excess of the Point of Attachment specified." Blue Cross's certificate of authority authorizes it to be in the business of "Health" insurance; stop-loss policies must be authorized by its certificate to permit Blue Cross to sell them.[40] The Comptroller further cites Blue Cross's availment of a regulatory exception that characterizes stop-loss policies as health insurance,[41] and relies on the characterization of stop-loss insurance as "direct insurance in the nature of health insurance" in *Texas Department of Insurance v. American National Insurance Co.*[42] Finally, the Comptroller points to the purpose

---

[39] *Id.* § 257.003(a)(1).

[40] *Id.* § 801.052.

[41] *See* 28 Tex. Admin. Code § 3.4004(e)(2)(J) (exempting "group stop loss/excess loss policies containing an attachment point of $5,000 or more" from the filing requirements applicable to Insurance Code Chapter 1701); Tex. Ins. Code § 1701.002(1)(A) (applying Chapter 1701 to "accident or health insurance, including group accident or health insurance").

[42] 410 S.W.3d 843, 855 (Tex. 2012).

of the maintenance tax—which covers the costs of regulating insurers—as favoring its interpretation.

Blue Cross responds that stop-loss policies are not health insurance because the losses covered by health insurance—bodily injury, death, or sickness—are suffered by natural persons, not employers. Blue Cross argues that the fact that it is generally in the business of health insurance does not mean that every policy it sells is subject to the maintenance tax, relying on a definition of "accident and health insurance policy" found in the Insurance Code.[43] The statutory definition of "[a]ccident and health insurance policy" is limited to the chapter substantively regulating health insurance,[44] however, and therefore is of little help in determining whether the stop-loss policies qualify as a type of "health insurance" for the purposes of collecting the maintenance tax.

The purpose of the maintenance tax is to collect funds to cover the costs of regulating the industry.[45] The question is therefore whether these stop-loss policies are administratively regulated as life, health, and accident insurance in this state. The summary-judgment evidence confirms that they are.

---

[43] *See* Tex. Ins. Code § 1201.001 ("In this chapter: (1) 'Accident and health insurance policy' includes any policy or contract that provides insurance against loss resulting from: (A) accidental bodily injury; (B) accidental death; or (C) sickness.").

[44] *Id.*; *see also id.* § 1201.002 (describing the purpose of Chapter 1201).

[45] *See id.* § 257.002(b) (varying the tax rate to produce the amount necessary to recover regulatory costs).

Blue Cross's certificate of authority authorizes it to transact "in the business of Accident; Health; Reinsurance on all lines authorized to be written on a direct basis; and the authority to transact business as a Health Maintenance Organization offering Basic Health Care Service Plan." As Blue Cross's expert agreed, the Texas Department of Insurance "provides stop-loss writers authority to issue stop-loss under the category of health insurance." The Department does not issue separate permits to issue stop-loss insurance policies. If stop-loss policies are not a kind of health insurance, then in the broadest regulatory sense, Blue Cross would lack authority to sell it. Blue Cross concedes in its briefing that stop-loss policies are "treated, for administrative and regulatory purposes, as accident and health insurance."

Our decision in *American National* supports the conclusion that stop-loss policies are regulated as health insurance. In that case, we examined whether stop-loss policies are "direct health insurance" or "reinsurance"—and therefore not subject to state regulation.[46] The State argued that stop-loss policies are "direct insurance in the nature of health insurance because the stop-loss policies are purchased by the plans to cover ultimate claims associated with their health-care expenses."[47] We deferred to the State's "reasonable," "formally promulgated" construction, which was "not expressly contradicted by the Insurance Code."[48] Though we did not hold stop-loss policies to be

---

[46] *Am. Nat'l Ins. Co.*, 410 S.W.3d at 845.

[47] *Id.* at 847.

[48] *Id.* at 855.

equivalent to traditional health insurance, we endorsed the State's position that stop-loss policies are—for regulatory purposes—of that variety.

Because stop-loss insurance is regulated as health insurance and Blue Cross is not authorized to sell stop-loss insurance apart from its certificate to sell health insurance, we conclude that stop-loss premiums are subject to Chapter 257's maintenance tax.

\* \* \*

We hold that Blue Cross's stop-loss policies cover risks on individuals and groups and arise from the business of health insurance. Accordingly, the premiums Blue Cross collects on these policies are subject to taxation under Chapter 222. Because, for administrative and regulatory purposes, Blue Cross collects these premiums under its authority to write health insurance, we further hold that they are subject to Chapter 257's maintenance tax. We reverse the court of appeals' judgment and render judgment for the Comptroller.

Jane N. Bland
Justice

**OPINION DELIVERED:** June 17, 2022

17