# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00864-CV

---

**Appellants, Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and
Ken Paxton, Attorney General of the State of Texas //
Cross-Appellant, Health Care Service Corporation, A Mutual Legal Reserve Company,
d/b/a Blue Cross and Blue Shield of Texas**

**v.**

**Appellee, Health Care Service Corporation, A Mutual Legal Reserve Company,
d/b/a Blue Cross and Blue Shield of Texas //
Cross-Appellees, Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and
Ken Paxton, Attorney General of the State of Texas**

---

### FROM THE 200TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-003105, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellee and cross-appellant Health Care Service Corporation, A Mutual Legal
Reserve Company, d/b/a Blue Cross and Blue Shield of Texas (BCBS), sells "stop-loss" policies
to businesses that self-insure, meaning the businesses provide their employees with health
insurance by directly funding the employees' healthcare benefits. The stop-loss policies in
question here limit the self-insured employer's liability by providing coverage for employee-
health-benefit costs that exceed a certain amount. In other words, a stop-loss policy caps the
employer's healthcare costs at a set level, insuring the employer against any unusually high
healthcare costs in a particular year. Appellant and cross-appellee Glenn Hegar, Comptroller of

Public Accounts of the State of Texas, conducted an audit and determined that BCBS owed $3,005,270.13 in premium taxes and $68,691.89 in maintenance taxes on the stop-loss policies it had sold to self-insured employers in 2012. *See* Tex. Ins. Code §§ 222.002, 257.003.

BCBS paid the taxes under protest and then filed the underlying taxpayer suit against the Comptroller and Ken Paxton, Attorney General of the State of Texas (collectively, the Comptroller). The Comptroller filed a counterclaim arguing that if the stop-loss policies are not health or accident insurance, BCBS was not authorized to write the policies and was thus liable for damages. The parties filed competing motions for summary judgment, the trial court granted BCBS's motion and denied the Comptroller's, and the Comptroller then nonsuited his counterclaim. The question we must decide in this appeal is whether the premiums BCBS collected on its stop-loss policies were from a contract or policy covering risks on individuals or groups and arising from the business of health insurance so as to be subject to premium taxes, *see id*. § 222.002, or from writing health insurance so as to be subject to maintenance taxes, *see id*. § 257.003. Alternatively, the Comptroller argues that if BCBS would otherwise be entitled to a refund, it submitted insufficient evidence to support its asserted refund calculations. In its cross-appeal, BCBS argues that in granting summary judgment, the trial court also granted summary judgment on BCBS's sought amount of refund. We affirm the trial court's order granting BCBS's motion for summary judgment and need not address BCBS's cross-appeal.

## STANDARD OF REVIEW

When, as here, both parties move for summary judgment and the court grants one motion and denies the other, we conduct a de novo review, considering the evidence presented, determining all questions presented, and, if we determine that the trial court erred, rendering the

2

judgment the trial court should have rendered. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The construction of a statute is an issue we review de novo. *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). Our primary objective when construing a statute is to determine and give effect to the Legislature's intent. *Texas Dep't of Ins. v. American Nat'l Ins. Co.*, 410 S.W.3d 843, 853 (Tex. 2012). We begin with the words chosen by the Legislature and, if the statute is clear and unambiguous, apply the common meaning of the statutory language unless a different meaning is apparent from context or the plain meaning leads to absurd results. *See id.* (quoting *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008)); *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010). If a statute is ambiguous, we consider the construction applied by the administrative agency charged with its enforcement, giving that construction serious consideration, as long as that construction is reasonable and does not contradict the plain statutory language. *American Nat'l Ins.*, 410 S.W.3d at 853 (quoting *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993)).

However, "agency deference does not displace strict construction" when we are asked whether a tax statute applies. *TracFone Wireless, Inc. v. Commission on State Emergency Commc'ns*, 397 S.W.3d 173, 182-83 (Tex. 2013). Instead, we apply "an ancient pro-taxpayer presumption: The reach of an ambiguous tax statute must be construed 'strictly against the taxing authority and liberally for the taxpayer.'" *Id.* at 182 (quoting *Morris v. Houston Indep. Sch. Dist.*, 388 S.W.3d 310, 313 (Tex. 2012) (per curiam)). "In other words, a tax must apply unequivocally." *Id.* Ambiguous or imprecise tax statutes "must be interpreted 'most strongly against the government, and in favor of the citizen,'" and "we will not extend the reach of an

ambiguous tax by implication, nor permit tax collectors to stretch the scope of taxation beyond its clear bounds." *Id*. at 183 (quoting *Gould v. Gould*, 245 U.S. 151, 153 (1917)).

## DISCUSSION

Section 222.002 provides in relevant part that an annual tax is imposed on "each insurer that receives gross premiums subject to taxation under this section," and that in determining its taxable gross premiums, the insurer shall include all premiums received from "any kind of . . . insurance policy or contract covering risks on individuals or groups located in this state and arising from . . . the business of" health insurance. Tex. Ins. Code § 222.002(a), (b). Section 257.003 imposes maintenance taxes on, as relevant to this case, "gross premiums collected from writing life, health, and accident insurance in this state." *Id*. § 257.003(a). The Comptroller insists that the premiums BCBS collected on its stop-loss policies are subject to premium or maintenance taxes.

BCBS has a certificate of authority, issued by the Texas Department of Insurance (TDI), allowing it to transact "the business of Accident; Health; Reinsurance on all lines authorized to be written on a direct basis; and the authority to transact business as a Health Maintenance Organization offering Basic Health Care Service Plans." The Comptroller argues that the fact that the certificate does not list stop-loss as a separate category, along with BCBS's assertions in its summary judgment evidence that TDI does not offer separate certificates of authority for stop-loss insurance and instead allows for the issuance of such policies "under the category of health insurance," must mean that BCBS's issuance of stop-loss policies falls within "the business of health insurance." The Comptroller further notes that BCBS lists stop-loss insurance and premiums on its Annual Statements under "Health Business" and sought an

4

exemption from certain insurance-form requirements that apply only to "group and individual accident and/or health policies," arguing that those facts show that BCBS itself considers stop-loss policies to be group policies arising from the business of health insurance. Finally, the Comptroller contends that we "should interpret the premium tax statutes in the Insurance Code to avoid gaps in coverage."

*DOES THE PREMIUM TAX APPLY?*

We begin by asking whether the premium tax, which is assessed against premiums received from insurance that covers "risks on individuals or groups" and that arise from the business of health insurance, applies to the stop-loss policies in question. *Id*. § 222.002(b).[1] The Comptroller argues that the stop-loss policies (1) should be viewed and treated as health-insurance policies that cover risks on groups, consistent with TDI's treatment of such policies,[2] and (2) arise from the business of health insurance.

Chapter 1701 of the insurance code, titled "Policy Forms," governs the forms that insurers may use in transacting their business, explaining how the forms are approved or disapproved and providing remedies against insurers who use misleading or noncomplying

---

[1] Stop-loss policies are mentioned in section 222.002 only in a provision explaining that an insurer need not include in its taxable gross premiums amounts it receives for stop-loss policies issued to health maintenance organizations. Tex. Ins. Code § 222.002(d). Such policies are to be "considered reinsurance," and reinsurance premiums are excluded from taxable gross premiums. *Id*. § 222.002(c)(3), (d).

[2] The Comptroller does not argue that "individuals" should be read to encompass companies or corporate entities, and we note that the word "individual" generally refers to a human being, as opposed to "person," which in legal usage often includes corporations or other such entities. *See, e.g.*, *Colorado County v. Staff*, 510 S.W.3d 435, 449 n.59 (Tex. 2017); *First Cash, Ltd. v. JQ-Parkdale, LLC*, 538 S.W.3d 189, 196 (Tex. App.—Corpus Christi–Edinburg Jan. 11 2018, no pet.); *Global Evangelism Educ. Ministries, Inc. v. Caddell*, No. 04-08-00686-CV, 2009 WL 398255, at *1 (Tex. App.—San Antonio Feb. 18, 2009, no pet.) (mem. op.); *City of Corinth v. NuRock Dev., Inc.*, 293 S.W.3d 360, 370 (Tex. App.—Fort Worth 2009, no pet.).

5

forms. *See generally id.* §§ 1701.001-.151. A form that is subject to chapter 1701 must be filed with and approved by TDI, *id.* § 1701.051, and TDI is authorized to exempt certain documents from the chapter's requirements, *id.* § 1701.005(b). Section 1701.002, "Applicability of Chapter to Forms of Certain Documents," provides that chapter 1701 applies to certain enumerated documents, including "a policy, contract, or certificate" of "accident or health insurance, including group accident or health insurance." *Id.* § 1701.002(1)(A).

Acting under its chapter 1701 authority, TDI promulgated a rule requiring "[a]ll life and accident and sickness policy forms and annuity contract forms intended for use in this state, including application forms, rider or endorsement forms not specifically exempted by these sections," to be approved before use. 28 Tex. Admin. Code § 3.4002 (2020) (Tex. Dep't of Ins., All Forms To Be Filed For Review Unless Specifically Exempted). Another rule exempts from review and approval "group and individual accident and/or health policies, contracts, certificates, applications, enrollment forms, riders, amendments, endorsements, and related forms (including but not limited to outlines of coverage, notices, rates, and conditional receipts) applicable thereto," that provide certain coverages, including "group stop loss/excess loss policies containing an attachment point of $5,000 or more."[3] *Id.* § 3.4004(e)(2)(J) (Tex. Dep't of Ins., Exempt Forms).

The Comptroller asserts that those agency rules establish that TDI "plainly considers stop-loss policies to be 'group and individual accident and/or health policies.'" Additionally, the Comptroller notes, BCBS sought and obtained for its stop-loss policy forms an

---

[3] An "attachment point" is the threshold to which a self-insured employer's healthcare costs must rise before the stop-loss policy will reimburse the employer for further costs.

exemption from further review that "applies only to 'group and individual accident and/or health policies,'" thus confirming that the policies arose from the business of health insurance.

The Comptroller also points to the Texas Supreme Court's decision in *American National* for support in categorizing stop-loss as health insurance subject to the premium tax. However, *American National* was not deciding what stop-loss insurance was; it was considering whether TDI could regulate stop-loss insurance at all, more specifically, whether stop-loss insurance sold to self-insured employers was "direct health insurance"—and thus subject to regulation by TDI and the imposition of an assessment paid to the now-abolished Texas Health Insurance Risk Pool—or was instead "reinsurance," which is not regulated by the state and was not subject to an assessment. 410 S.W.3d at 845. The court discussed the difference between reinsurance and direct insurance, noting that self-insured employers "are clearly not insurance companies," although they "perform a similar service." *Id.* at 848. The court further observed that TDI had for years categorized stop-loss coverage as direct insurance subject to assessment for the risk pool under former article 3.77, which defined an "insurer" subject to an assessment as "[a]ny entity that provides health insurance in this state, including stop-loss or excess loss insurance." *Id.* at 850 (quoting former Tex. Ins. Code art. 3.77, § 13(a), *repealed by* Act of June 21, 2003, 78th Leg., R.S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138). The court explained that TDI, as the agency charged with enforcement of the insurance code, had "concluded that stop-loss insurance purchased by a plan does not involve two insurers and is therefore not reinsurance. It is instead direct insurance in the nature of health insurance because the stop-loss policies are purchased by the plans ultimately to cover claims associated with their health-care expenses." *Id.* at 855. Because the agency's interpretation was reasonable, formally

7

promulgated, and not expressly contradicted by the insurance code, the court deferred to TDI's construction and held that stop-loss insurance was direct insurance subject to TDI regulation. *Id*.

First, we note that article 3.77, which defined "insurer" to include an insurer that issued stop-loss insurance, has been repealed.[4] Further, *American National* asked whether stop-loss policies were subject to state regulation, an inquiry that could appropriately consider and defer to the agency's interpretation, rather than whether premiums on such policies could be subject to tax, a question that must be strictly construed in favor of the taxpayer. *Compare id*. at 845, *with TracFone Wireless*, 397 S.W.3d at 182. Indeed, all of the Comptroller's arguments as to whether stop-loss policies cover risks on groups require that we defer to TDI's or the Comptroller's interpretation or infer a conclusion based on TDI's administrative rules or on filings BCBS made with TDI to comply with such rules. In a tax case, however, we cannot rely on such information and instead must look at the plain statutory language and construe it strictly in favor of BCBS, finding in favor of taxation only if the tax applies "unequivocally." *See TracFone Wireless*, 397 S.W.3d at 182.

---

[4] Article 3.77 and the Texas Health Insurance Risk Pool itself have been abolished. *See* Act of June 21, 2003, 78th Leg., R.S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138; Act of May 21, 2013, 83d Leg., R.S., ch. 615, 2013 Tex. Gen. Laws 1640, 1640-42. The insurance code currently mentions stop-loss insurance a total of sixteen times, such as in allowing the administrator of the Healthy Texas Small Employer Premium Stabilization Fund to "purchase stop-loss insurance or reinsurance" as deemed necessary, Tex. Ins. Code § 1508.261; providing certain stop-loss requirements for multiple employer welfare arrangements, *id*. §§ 846.053(h), .153, .156; or allowing TDI's commissioner to obtain stop-loss coverage for risks incurred by the Temporary Health Insurance Risk Pool, *id*. § 1510.005(b). In the context of health-insurance contracts with municipalities, the insurance code defines an "insurer" as "an insurance company, including a company providing stop-loss or excess loss insurance," and bars an insurer that "provides stop-loss or other insurance coverage for health benefits" to municipalities from excluding certain individuals. *Id*. §§ 1550.051, .053. On the other hand, in the portions of the code governing managed care, multiple employer welfare arrangements, healthcare quality insurance, and the Health Insurance Portability and Availability Act, stop-loss insurance is specifically excluded from the definition of "health benefit plan." *Id*. §§ 846.001(3)(M), 847.003(2)(J), 1274.001(2)(O), 1501.002(5)(M).

8

Black's defines a "group policy" as an "insurance policy that covers multiple insureds under a group-insurance plan." *Group Policy*, Black's Law Dictionary (11th ed. 2019). The insurance code bears that out. For instance, in the chapter pertaining to "Group and Blanket Health Insurance," "group accident and health insurance" is defined as "accident, health, or accident and health insurance covering a group" of individuals, Tex. Ins. Code § 1251.001(2), such as a policy obtained by an employer for its employees or an association for its members, *id*. §§ 1251.051-.056.[5] And section 1252.003 states that "health benefit plan coverage is provided on a group-type basis" if the plan provides coverage under an insurance policy to a class of employees or members of an association, determined by the individuals' employment or membership; coverage is not available to the general public and can only be obtained through the covered individual's employment or membership status; the plan is sponsored by the employer or association; and premiums are paid to the insurer on an aggregate or bulk-payment basis. *Id*. § 1252.003(a). Thus, the insurance code, when it discusses "group" coverage or policies in the relevant context, refers to health insurance provided to individual members of a group, whether through their employment or membership in various kinds of associations.

Noting that BCBS's forms use language like "employer group name," the Comptroller asserts that stop-loss insurance is insuring risk on groups. We disagree. Stop-loss insurance touches on and involves a group policy but does not cover risks to the individual members of the group—in this case, the self-insured employer's employees—and is not an individual accident and health insurance policy. Instead, it covers the *employer's* risk, providing

---

[5] Chapter 1201, titled "Accident and Health Insurance," on the other hand, concerns individual policies and defines an "accident and health insurance policy" as "any policy or contract that provides insurance against loss resulting from" sickness or accidental bodily injury or death, specifying that the chapter applies "only to an individual accident and health insurance policy." *Id*. §§ 1201.001(1), .003(a), (b).

a cap for the *employer's costs* in paying for its employees' medical care. In other words, stop-loss insurance insures the employer against the excess risk the employer assumes when it takes responsibility for its group members' medical costs—it does not insure the group of members against individual medical costs or losses. Indeed, the Comptroller has taken this very position in administrative proceedings, asserting that a "stop loss policy's coverage is primarily for the employer/trust that is seeking to limit its own financial risk and not to obtain health insurance, which is provided under a separate policy." Tex. Comptroller of Pub. Accts., Comptroller Docket Nos. 109,354-355, 2016 WL 3469269, at *6 (Mar. 8, 2016). The Comptroller's staff noted that a stop-loss policy protects the *employer* from economic loss—the contract is between the insurer and the employer, not the employee group members; plan participants rely on their employer, not the insurer, for benefit payments; and the insurer has no direct contractual obligation to the participants. *Id*. (quoting White Paper: "*Stop Loss Insurance, Self Funding & the Affordable Care Act*," National Association of Insurance Commissioners (2015): 14-38, http://www.naic.org/documents/PRC-ZS-15-02_Vol2.pdf). The Comptroller agreed that "stop-loss policies should not be considered health insurance," pointing to case law that supported distinguishing between stop-loss insurance and the underlying group health policies to which they are anchored and noting that in *American National*, the Texas Supreme Court held that the stop-loss policies were direct insurance "in the nature of direct health insurance" but not that the policies were health insurance policies. *Id*. at *7-8 (quoting 410 S.W.3d at 854-55).

The Comptroller also urges us to interpret the statute to "avoid gaps in coverage," noting that throughout much of the insurance code, the legislature used expansive language in imposing premium taxes. *See, e.g.*, Tex. Ins. Code §§ 221.002(b), (c) (property and casualty insurance premium tax assessed against premiums received "from any kind of insurance written

10

by the insurer on each kind of property or risk located in this state," except for certain enumerated premiums, including those received "from the business of . . . health and accident insurance"), 226.003(b), (g) (unauthorized insurance premium tax assessed against "any premium for insurance on a subject resident, located, or to be performed in this state," except for "premiums on a contract of insurance written by an insurer that holds a certificate of authority in this state and that is authorized to write the contract"). However, as the supreme court has explained, "Tax policy gap-filling—specifically, deciding who is taxed—is best left to legislators, not courts or agencies." *TracFone Wireless*, 397 S.W.3d at 176. And we cannot ignore the language used in this particular statute, which rather than simply providing in broad terms that the tax should be assessed against any premiums from policies arising from the business of health insurance, adds a narrowing provision limiting the tax to premiums from insurance policies that "cover[] risks on individuals or groups." Tex. Ins. Code § 222.002(b).

After applying common meanings of the statutory language within the context of the insurance code, we strictly construe the language of section 222.002(b) against taxation to conclude that a stop-loss policy issued to a self-insured employer is not an "insurance policy or contract covering risks on individuals or groups." *See id*. § 222.002(b). Because we so hold, we need not consider whether the stop-loss policies arise from the business of health insurance—the other requirement for a policy to be subject to the premium tax. We overrule the Comptroller's first issue on appeal.

## *DOES THE MAINTENANCE TAX APPLY?*

As for the maintenance tax, section 257.003 imposes the tax on "gross premiums collected from writing life, health, and accident insurance in this state," except for exceptions not

11

applicable here. *Id*. § 257.003(a)(1). The Comptroller argues that the stop-loss premiums should be considered to be "from writing health insurance" and that such an interpretation promotes the purpose of the maintenance tax—"to pay the expenses during the succeeding year of regulating life, health, and accident insurers." *Id*. § 257.003(b). He notes that every other type of insurance is taxed to pay for these costs and that it would be unfair for stop-loss policies to go without paying their fair share of maintenance taxes. However, as explained earlier, we cannot apply a "gap-filling" interpretation that is not supported by the plain language of the statute, which we strictly construe in favor of the taxpayer. *TracFone Wireless*, 397 S.W.3d at 176, 183.

The Comptroller also cites the chapter 1201 definition of "accident and health insurance policy" as "any policy or contract that provides insurance against loss resulting from" sickness or accidental bodily injury or death. *Id*. § 1201.001(1). Because stop-loss policies insure self-insured employers against loss resulting from abnormally high healthcare costs, the Comptroller insists, those policies should be considered health insurance under the chapter 1201 definition. However, chapter 1201, which is intended to standardize and simplify "terms and coverages in individual accident and health insurance policies" and promote public understanding of insurance coverages, *id*. § 1201.002, applies to "an accident and health insurance policy" and, more specifically, "only to an individual accident and health insurance policy," *id*. § 1201.003(a), (b).[6] Stop-loss policies do not provide health insurance to individual insureds as contemplated by chapter 1201 and, thus, the chapter 1201 definition of "accident and health insurance policy" cannot be read as applying to the stop-loss policies at issue in this case.

---

[6] To that end, chapter 1201 imposes various requirements on what health insurance policies must cover, what such policies must state, and who may be covered. *See generally id*. §§ 1201.001-.702.

12

Similarly, stop-loss policies do not fit within the definition of group health policies discussed earlier and found in chapter 1251. *See generally id.* §§ 1251.001-.451.

It is true that BCBS is a health-insurance company and, therefore, many of the policies it sells will be subject to the maintenance tax. However, not every policy it sells is necessarily subject to the tax—only policies that fit within section 257.003. It would strain the plain statutory language of section 257.003 to conclude that stop-loss premiums, which are collected in exchange for insuring an employer's risk arising out of its employees' healthcare costs, are "collected from writing" health insurance. Indeed, the stop-loss policies in question protect an employer from risk incurred from deciding to pay its employees' healthcare costs rather than obtain health insurance. In other words, BCBS sells the policies to employers who do not ask an insurer to write health insurance. The stop-loss premiums thus are not subject to the section 257.003 maintenance tax. We overrule the Comptroller's second issue on appeal.

### *ISSUES RELATED TO THE REFUND AMOUNT*

The Comptroller's third issue and BCBS's cross-appeal concern the amount of the refund and the sufficiency of the evidence produced by BCBS to establish that amount. The Comptroller argues that even if BCBS is entitled to a refund, it did not submit sufficient evidence to support its asserted refund amount. BCBS explains that it filed its notice of appeal "to provide the initial clarification to this Court, in that 'all parties and claims have been disposed of,'" and that it "seeks clarification that the summary judgment addresses the refund amount proven in" its motion for summary judgment. It further argues that it produced sufficient evidence to support its requested refund and that in ordering that BCBS's "Motion for Summary Judgment is GRANTED and [the Comptroller's] Motion for Summary Judgment is DENIED," the trial court

13

effectively ordered that BCBS was entitled to a refund totaling $3,072,232.17, as requested in BCBS's motion for summary judgment and accompanying evidence.

A judgment is final "if it disposes of all pending parties and claims in the record." *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001). A final order need not have a particular form or language, and instead we determine whether an order is final from its language and, if necessary, the record in the case. *Id.*; see Bella Palma, LLC v. Young, 601 S.W.3d 799, 801 (Tex. 2020) ("a clear and unequivocal statement of finality must be 'given effect' even if review of the record would undermine finality"). If the judgment or order is vague, the appellate record may be considered in determining finality. *See M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 674-75 (Tex. 2004) (citing *Lehmann*, 39 S.W.3d at 206). Thus, there must be some "clear indication that the trial court intended the order to completely dispose of the entire case." *Lehmann*, 39 S.W.3d at 205. The certainty of a final judgment "is not dissipated" if a trial-court clerk must take some additional step determinable by ministerial act before a writ of execution may be produced. *International Sec. Life Ins. Co. v. Spray*, 468 S.W.2d 347, 350 (Tex. 1971).

In its motion for summary judgment, BCBS concluded, "This court should grant BCBS's motion for summary judgment and rule that the premiums received from the sale of stop-loss insurance are exempt from premium and maintenance taxes, and grant BCBS a refund of the taxes at issue." BCBS stated that the "[a]mount of tax paid on stop-loss premiums is $3,072,232.17" and referenced an affidavit by Alfred Trotter, BCBS's Director of Corporate Tax, who averred that BCBS sought a total refund of $3,072,232.17, explaining his calculations in relevant part as follows:

14

On December 30, 2016, BCBS filed with the [Comptroller] an amended Texas Annual Insurance Premium Tax Report, the Computation of Non-Taxable Premiums form, The Texas Annual Maintenance, Assessment and Retaliatory Report, the Retaliatory Worksheet, and a reconciliation of the change from the original filed returns for tax year 2012.

The amended returns reflect a request for refund of overpaid taxes based on the inclusion, for tax purposes, of BCBS's contributions for its employee benefits plan, as well as premiums on stop-loss insurance insuring legal entities.

The amendments to the 2012 returns resulted in refund requests of $3,005,270.13 in premium taxes and $68,691.89 in maintenance taxes for a combined refund of $3,073,962.02.

The Comptroller allowed an adjustment based on the contributions for the employee benefit plan but disallowed the adjustment for the stop-loss premiums.

The disallowed refunds total $3,072,232.17.

BCBS's Texas stop-loss premiums for calendar year 2012 totaled $171,633,082.

BCBS's Corporate Tax Department calculated the tax refund due.

The starting point for the reporting of 2012 tax year premiums for tax purposes began with the premium reported in the Annual Statement filed with the National Association of Insurance Commissioners ("NAIC").

Premiums received from group policies and individuals are allocated to Texas based on the residence of each subscriber. . . . The stop-loss premiums were allocated to Texas on this same basis although the insured on such policies were not the subscribers but instead the employee benefit plan sponsors, with a situs at the headquarters of each employer.

After the filing and payment of taxes, it was determined that the Texas insurance tax statutes no longer include stop-loss related premiums in the tax base. To amend the tax returns and request a refund of overpaid taxes, the premiums used on the original filing had to be adjusted.

15

To determine the situs for each insured entity for each stop-loss policy, the address of the plan sponsor was identified, and the stop-loss ledger account was adjusted to reflect a premium amount for stop-loss premiums for Texas tax purposes. Premiums received under stop-loss contracts and originally included as Texas accident & health premiums for tax purposes were the basis for the 2012 refund request.

In his motion for summary judgment, arguing that the premium and maintenance taxes apply, the Comptroller stated that if the court held that the taxes did not apply, "the parties will litigate the refund amount." The trial court held a hearing on the motions for summary judgment in January 2019 and in March signed an order stating, "IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Plaintiff's Motion for Summary Judgment is GRANTED and Defendants' Motion for Summary Judgment is DENIED. This is not a final judgment, because Defendants' counterclaim remains pending."

BCBS next filed a motion to dismiss the Comptroller's counterclaim for lack of jurisdiction, the parties filed several replies, and the trial court heard the motion in late May 2019. About two weeks later, BCBS filed a supplemental reply brief stating that in that May hearing, the Comptroller had "claimed that Plaintiff has not proven the refund amount and that despite prevailing on the underlying suit on cross-motions for summary judgment and regardless of the outcome of this jurisdictional dispute, Plaintiff must still have a hearing or trial to prove the refund amount. This is unsupported by the evidence."[7] BCBS again referred to Trotter's affidavit, his calculations, and his explanations of the source documents from which the sums were gathered. BCBS noted that in his response to BCBS's motion for summary judgment, the Comptroller did not dispute the sought refund amount, and that the trial court's order specified

---

[7] The parties have provided reporter's records from the January and October 2019 hearings but not from the May 2019 hearing.

16

further proceedings only as to the Comptroller's counterclaims, not as to the refund amount. Thus, BCBS asserted, the "assertion that the refund amount is still in dispute is not supported by the evidence." About two months later, the Comptroller filed a notice of nonsuit of its counterclaim and a motion for new trial, again arguing that the premium and maintenance taxes applied. In the motion for new trial, the Comptroller did not take issue with BCBS's evidence related to the refund amount or with whether the trial court had determined the refund amount in the first place. In his response to BCBS's motion for entry of a final judgment, filed in September 2019, however, the Comptroller asserted that BCBS had not satisfied the requirements of section 112.151(f) to produce contemporaneous records and supporting documentation to establish the amount of any refund, contending that the amount of any potential refund "is still in question and must be litigated." BCBS filed a reply, attaching a fourth affidavit by Trotter, which presented the same assertions of refund amounts and attached the various source documents he had cited in his earlier affidavits.

In October 2019, the trial court heard argument on BCBS's motion to enter final judgment. In that hearing, BCBS argued that the only reason the earlier order on summary judgment was not final was because "we had to carve out the counterclaim." The Comptroller stated, "You granted summary judgment. The outstanding—an outstanding issue was unauthorized insurance," but then argued that the amount of the refund was still live, asserting that the only issues argued in BCBS's motion were whether the two taxes applied. Thus, the Comptroller claimed, the trial court "did not resolve the amount of the refund as a result of your decision on those two issues, and so, Your Honor, there is no summary judgment on that." BCBS disagreed, referring the trial court to its motion, in which it pled the specific refund sought and asked for judgment on that amount, and noting that the Comptroller had not disputed the

17

pled amount in its summary judgment response. In February 2020, the trial court signed an order granting the Comptroller's nonsuit. It did not sign further orders mentioning the refund amount.

BCBS's motion for summary judgment argued that the two tax statutes did not apply and specifically sought a refund of $3,072,232.17. The trial court's order on summary judgment granted BCBS's motion without reserving any issues or fact questions raised in the motion, explicitly stating that the order was not final only because of the Comptroller's pending counterclaim. The reporter's record from the initial summary judgment hearing does not show that the parties discussed the amount of refund sought by BCBS, although they did refer in passing to Trotter's affidavit, which clearly stated the amount of refund BCBS requested, as did BCBS's motion for summary judgment. In hearings held after the trial court granted summary judgment, the parties and the court discussed whether the court had intended to award BCBS's sought amount, and after those later hearings, the trial court opted not to sign any further orders other than one granting the Comptroller's nonsuit. The record supports a conclusion that in granting BCBS's motion for summary judgment in its entirety, the trial court intended to also grant BCBS's request for a refund of $3,072,232.17. *See Lehmann*, 39 S.W.3d at 205. Further, although the summary judgment order does not recite a refund amount, the prayer of BCBS's motion, which was granted in whole, states the specific refund amount sought, an amount that was not challenged by the Comptroller until months later. It would require a mere ministerial act for a trial-court clerk to refer to BCBS's motion for the specific amount when proceeding with a writ of execution. *See In re Blankenhagen*, 513 S.W.3d 97, 99 (Tex. App.—Houston [14th Dist.] 2016, orig. proceeding) (holding that trial-court judgment based on mediator's decision was not final because amount of damages could not be ascertained from judgment or reference to

18

mediator's decision);[8] *see also Spray*, 468 S.W.2d at 350 ("So long as the judgment of the court makes the figure which the clerk is to place in the writ of execution determinable by ministerial act, the judgment cannot be said to lack definiteness."). Thus, the trial court's full granting of BCBS's motion for summary judgment in its taxpayer refund suit, which clearly and unequivocally specified the amount sought, must be read as granting BCBS's request for that refund amount. When the Comptroller nonsuited its counterclaim and the trial court signed its order granting nonsuit, the last pending issue was resolved, rendering the summary judgment order final.[9]

---

[8] In *In re Blankenhagen*, a construction contract provided that disputes about defective work would be submitted to an architect as the "Initial Decision Maker" and then to the trial court for entry of a judgment. 513 S.W.3d 97, 99 (Tex. App.—Houston [14th Dist.] 2016, orig. proceeding). A dispute arose, and the homeowners obtained repair bids ranging from $366,636 to $513,216, claimed their entitlement to $10,000 as a timely-completion penalty, and then requested $523,316 in their "Request for Initial Decision," stating that was "the HIGHEST amount of the estimates." *Id*. The architect issued an Initial Decision that stated, "I approve the owner's claim," but did not state a damages amount, and the homeowners brought the matter to the trial court for entry of a declaratory judgment. *Id*. The trial court signed a judgment stating that the contractor owed the homeowners "the amounts as set out in the Initial Decision entered by the Architect" and that the judgment was final and appealable. *Id*. The court of appeals disagreed with the homeowners' assertion that the architect clearly intended to award them the full amount they requested, looking to the language of the Initial Decision, which included a discussion of the homeowners' repair estimates, interpreting it as "generally approving the validity of" the claim, not the amount of damages. *Id*. at 101. Thus, the court concluded, the trial court's judgment was not final because the amount of damages "has not yet been determined and cannot be ascertained from" the judgment itself or Initial Decision. *Id*.

[9] In *In re Educap, Inc.*, on the other hand, the court of appeals determined that an order granting a motion for summary judgment that included a request for attorney's fees supported by the attorney's affidavit was not final. No. 01-12-00546-CV, 2012 WL 3224110, at *1 (Tex. App.—Houston [1st Dist.] Aug. 7, 2012, orig. proceeding) (mem. op.). In that case, attorney's fees were not pled as a specific counterclaim, although the court of appeals held that they were tried by consent by their inclusion in the defendant's answer and motion for summary judgment, and the order granting summary judgment did not include language from which the court of appeals could determine whether an award for attorney's fees had been made. *Id*. at *2-3. Further, even if the order could be read as including an award of attorney's fees, the court stated that the amount of the award could not be determined. *Id*. at *3. The opinion does not explain

We now consider the Comptroller's arguments related to the sufficiency of BCBS's evidence supporting its claimed refund amount.

Section 111.0041, which governs taxpayer records in general, provides that taxpayers must keep records for certain periods of time and shall:

> produce contemporaneous records and supporting documentation appropriate to the tax . . . for the transactions in question to substantiate and enable verification of the taxpayer's claim related to the amount of tax, penalty, or interest to be assessed, collected, or refunded in an administrative or judicial proceeding. Contemporaneous records and supporting documentation appropriate to the tax . . . may include, for example, invoices, vouchers, checks, shipping records, contracts, or other equivalent records, such as electronically stored images of such documents, reflecting legal relationships and taxes collected or paid.

Tex. Tax Code § 111.0041(c). In a suit for a tax refund:

> A taxpayer shall produce contemporaneous records and supporting documentation appropriate to the tax or fee for the transactions in question to substantiate and enable verification of a taxpayer's claim relating to the amount of the tax, penalty, or interest that has been assessed or collected or will be refunded, as required by Section 111.0041.

*Id.* § 112.151(f).

Several months after the trial court signed its order granting summary judgment, the Comptroller argued at a hearing that BCBS had not sufficiently established the refund amount. BCBS then filed multiple responsive documents, including a reply to the Comptroller's response to BCBS's motion for entry of final summary judgment, attaching Trotter's fourth affidavit. In Trotter's fourth affidavit, he referred to his earlier refund explanations and averred

whether the motion for summary judgment requested a specific amount or simply referred to the attorney's affidavit, nor can we tell how specific the affidavit was. *See id*. at *1-3.

20

that BCBS had on several occasions provided the Comptroller with BCBS's 2012 amended premium tax report; its 2012 non-taxable premiums worksheet; a 2012 Texas Annual Maintenance, Assessment, and Retaliatory Report; a 2012 Retaliatory Worksheet; a tax return reconciliation; and a "2012 BARS Stop Loss Premium Reconciliation to Return" form.[10] He attached those referenced documents as exhibits, along with a letter from the Comptroller—acknowledging BCBS's request for a refund of $3,073,962.02 in premium tax and $68,691.89 for maintenance tax and requesting further documentation—and a list of 2012 Refund Claim Accounts with names redacted. Trotter averred that the documents "are source documents for the refund calculation" that "allow the Comptroller to verify the refund claim" and then went through the various documents in some detail, explaining the documents' origins, meanings, and import and tracing BCBS's refund calculations through the documentation. He also stated that although BCBS had sent the documents to the Comptroller, the "Comptroller's auditor did not schedule an appointment with BCBS to review any of the tendered and available documentation." The Comptroller has not disputed that it received those documents.

On appeal, the Comptroller argues that the documents produced by BCBS were all created by BCBS, "no more than hearsay," and insufficient to establish the refund amount. However, although Trotter referred to those documents repeatedly in his first affidavit, which specified the sought refund amount, the Comptroller did not challenge the documents' sufficiency or veracity until September 2019, when he responded to BCBS's motion to enter a

---

[10] That form is a nine-page "schedule of every stop-loss premium received during the relevant period that identifies each self-funded employer plan by name and account number, the dollar amount of health aggregate stop-loss premium received from each plan, the health specific stop-loss premium, the total health stop-loss premium, dental stop-loss premium, stop-loss premium adjustments and refunds, stop-loss premiums to other states, stop-loss excess premium reclass, unbilled premium, and net stop-loss premiums."

final summary judgment.[11] In that document, the Comptroller for the first time asserted that BCBS had not satisfied its section 112.151(f) burden because it had not produced contemporaneous and supporting documentation and that the amount of any potential refund was "still in question and must be litigated." The Comptroller said that there was "a variety of potential evidence" that might satisfy BCBS's burden and that "generally, this evidence must be records and documents, or equivalent records, showing the items and transactions taxed, the amounts at issue, and the taxes previously collected." The Comptroller also stated that although Trotter stated the amount BCBS "believes it is entitled to," quoted "several figures he believed establishes" the refund amount, and "mention[ed] some documents that possibly helped him to reach that amount," "[n]one of those documents were produced by [BCBS], and even if they were, it is unclear if those documents would satisfy [BCBS's] statutory burden." The Comptroller concluded, "Without further evidence and records to support it, Mr. Trotter's affidavit does not help [BCBS] overcome its burden or move it closer to prevailing on its claim. [BCBS] has produced no other evidence to support its claimed refund amount." BCBS responded, noting that Trotter's affidavit referenced several specific documents that had been filed with the Comptroller multiple times starting in December 2016[12] and that the Comptroller had never disputed BCBS's calculations or reference documents.

---

[11] We note that the Comptroller asserted in his motion for summary judgment that the refund amount would have to be litigated if the trial court determined that the taxes did not apply and that, in a footnote in his response to BCBS's motion to dismiss his counterclaim for want of jurisdiction, the Comptroller stated that BCBS's motion for summary judgment "was for partial summary judgment because BCBS would need to prove up the refund amount if the policies were not subject to the Chapter 222 premiums tax." However, the Comptroller did not explain why BCBS's evidence was insufficient or challenge its reliability.

[12] Trotter averred that the documentation had been provided to the Comptroller multiple times, in December 2016, June 2017, July 2017, and October 2018.

The Comptroller does not dispute that BCBS sent the enumerated documents to the Comptroller multiple times before and after filing this refund suit, and he has not explained, either here or below, how those source documents—which include a listing of the stop-loss policies, BCBS's amended 2012 tax forms and worksheets, and its calculations of the taxes it had paid and the refunds it thus sought—are not "appropriate proof" to substantiate the requested refund amount. The Comptroller instead selects from the list of examples set out in section 111.0041(c) "invoices . . . checks . . . contracts," as if to argue that BCBS was required to produce copies of each individual invoice or contract sent to each stop-loss policy holder or canceled checks sent by each policy holder. We disagree.

As we have noted, "The plain language of [section 111.0041(c)] sets out the taxpayer's time period to prove its claim 'for the transactions in question' as being *during the administrative or judicial process*, not at the outset of filing, and *expressly allows flexibility as to the appropriate proof* to support a given transaction." *Hegar v. Ryan, LLC*, No. 03-13-00400-CV, 2015 WL 3393917, at *12 (Tex. App.—Austin May 20, 2015, no pet.) (mem. op.) (emphases added). Further, this is a tax case in which the controlling question is the application of the tax statutes in the first place, not how the taxes should be calculated. BCBS either owes the taxes it paid, as reflected on its produced 2012 tax forms, which the Comptroller has not challenged as incorrect or erroneous, or it does not. We have held that BCBS does not owe the taxes. Consistent with the trial court's grant of summary judgment, it is a straightforward conclusion that BCBS is entitled to a refund of the premium and maintenance taxes it paid. We further hold that BCBS sufficiently documented and supported the refund amount to which it is entitled. We overrule the Comptroller's third issue on appeal.

23

## CONCLUSION

We have overruled the Comptroller's issues on appeal. We thus affirm the trial court's order granting summary judgment, which determined that BCBS was entitled to a refund of $3,072,232.17. Because we conclude that the trial court has rendered a final judgment that disposes of all claims and that BCBS presented sufficient evidence to support its refund claim, we need not address BCBS's cross-appeal, which seeks relief only in the event we were to conclude otherwise.[13]

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Baker and Kelly

Affirmed

Filed: December 11, 2020

---

[13] BCBS's cross-appeal does not seek more or different relief than was awarded by the trial court. Instead, it was an attempted safety net in the event we did not believe the trial court had signed a final order or determined BCBS's evidence to be insufficient or improper.