**Affirmed and Opinion filed March 28, 2023.**



In The

# Fourteenth Court of Appeals

## NO. 14-22-00298-CV

**CARLYLE T. POINDEXTER; POINDEXTER & ASSOCIATES, INC.; AND SURETY ONE, INC., Appellants**

**V.**

**INSURANCE COMMISSIONER CASSIE BROWN AND THE TEXAS DEPARTMENT OF INSURANCE, Appellees**

**On Appeal from the 126th District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-GN-20-007713**

## O P I N I O N

This appeal involves an administrative order revoking the insurance licenses of appellants Carlyle Poindexter, Poindexter & Associates, and Surety One, Inc. Appellants obtained a performance bond for the Maverick County Solid Waste Authority ("MCSWA") pursuant to Texas Commission on Environmental Quality ("TCEQ") requirements for operation of a landfill. The Texas Department of

Insurance (the "Department") alleged that appellants overcharged MCSWA in bond premiums by several hundred thousand dollars over the course of six years. The case comes to us following a contested case hearing before an administrative law judge ("ALJ") from the State Office of Administrative Hearings, who recommended that appellants' insurance licenses be revoked. The Department's Commissioner adopted the ALJ's findings and conclusions. On judicial review in district court, a Travis County district judge affirmed the Commissioner's order, denied appellants' administrative appeal, and dismissed their claims with prejudice.

Appellants assert eight issues challenging the Commissioner's order. After a thorough review of the contested case hearing record, we conclude that substantial evidence supports the order, that the order does not improperly analyze and apply the Insurance Code, and that the order is not arbitrary or capricious. We thus overrule the dispositive issues in this appeal, and we affirm the trial court's judgment.

## Introduction

In 2012, MCSWA sought a surety bond to meet the financial assurance requirements of its TCEQ permit to ultimately close and maintain closure of a solid waste landfill. MCSWA engaged a local insurance company, LaVernia Insurance Agency, and its independent insurance agent, Jose Jaime Rodriguez,[1] to assist in obtaining the bond. Rodriguez contacted appellants to help locate a company willing to issue the bond. After rejections from numerous insurers, appellants placed the bond with Lexon Insurance Company. The bond limit of liability was $2.856 million. Appellants and MCSWA's board president signed the performance bond

---

[1] Rodriguez is a licensed insurance agent located in Eagle Pass, Maverick County, where the MCSWA board sits. He was the agent who assisted Maverick County with its property, life and health, worker's compensation, and liability insurance policies.

2

on May 1, 2012. From June 2012 to May 2018, the bond limit increased from $2.856 million to $3.8 million as additional sections of the landfill were opened. The annual bond premiums billed by Lexon increased as the bond limits increased.

Lexon came to believe that appellants were charging MCSWA more in premiums than they were remitting to Lexon. In 2017, Lexon filed a "Uniform Suspected Insurance Fraud" report with the Department. The following table illustrates the payments at issue among Lexon, appellants, and MCSWA:

| Bond Term | Lexon's Premium[2] Billed to Appellants | Appellants' Payment to Lexon | Appellants' Commission from Lexon | Appellants' Invoice to MCSWA | "Overage" Collected by Appellants |
|---|---|---|---|---|---|
| 6/1/2012 to 6/1/2013 | $57,130.30 | $45,704.24 | $11,426.06 | $99,979.00 | $42,848.70 |
| 6/1/2013 to 6/1/2014 | $58,920.00 | $47,136.00 | $11,784.00 | $93,302.00 | $34,382.00 |
| 5/1/2014 to 5/1/2015 | $72,777.00 | $58,221.60 | $14,555.40 | $127,360.00 | $54,583.00 |
| 5/1/2015 to 5/1/2016 | $73,796.00 | $58,221.60 | $14,759.20 | $129,145.00 | $55,349.00 |
| 5/1/2016 to 5/1/2017 | $74,534.00 | $59,627.20 | $14,906.80 | $130,434.00 | $55,900.00 |
| 5/1/2017 to 5/1/2018 | $75,303.00 | $60,402.40 | $15,100.60 | $132,130.00 | $56,627.00 |

---

[2] Amount includes a commission payable to appellants.

3

As shown, for the initial bond year, Lexon billed appellants $57,130.30, which included a commission of $11,426.06 for appellants. Appellants invoiced MCSWA for $99,979.00, and MCSWA remitted this amount to appellants. Appellants remitted $45,704.24 to Lexon. Thus, during the initial year, appellants collected from MCSWA $42,848.70 in excess of their commission. Over the six-year period at issue, appellants collected $712,350.00 from MCSWA, but remitted to Lexon only $329,313.04 in bond premiums and retained commissions of $82,532.06. Thus, for the six years at issue, they collected from MCSWA $299,689.70 more than they remitted to Lexon in premium payments. These figures are not disputed.

Based on Lexon's report and the Department's investigation, the Department notified appellants that it was seeking disciplinary action, which could include revocation of their insurance licenses. A contested case hearing was held before an ALJ, who recommended that the Department revoke appellants' insurance licenses in a Proposal for Decision ("PFD"). The Department adopted the ALJ's findings and conclusions. The following information is taken from the hearing record and the ALJ's PFD.

**Additional Record Evidence**

In September 2011, Lexon and appellants entered into an agency agreement that appointed Surety One as a general agent of Lexon to produce surety bonds. According to the agreement, appellants were entitled to receive from Lexon a ten percent commission on the type of bond that MCSWA required (closure/post-closure performance bond to ensure that MCSWA complied with TCEQ rules when closing and maintaining the closed landfill). Despite this general agreement, Lexon authorized appellants to retain a twenty percent commission on the annual MCSWA bond premium.

4

None of the invoices appellants provided to MCSWA disclosed any fees. There is no invoice for the original bond, but a copy of the "Performance Bond," effective May 1, 2012, is included in the record. On the final page of the bond, it states, "Bond premium: $99,979." The bond does not disclose any fees or commissions or the base premium amount Lexon billed to appellants.

The first invoice, dated May 1, 2013 on Surety One's letterhead, simply states, "Bond – MCSWA landfill renewal." The invoice additionally provides, "Terms, rates and fees quoted to principal upon execution of the original or renewal bond and broker disclosure continue with full force and effect with this continuation, and principal specifically consents to same." Each subsequent invoice—all of which are on Surety One's letterhead—contains this same language.

The record also contains several signed copies of a "Broker Commission Agreement and Compensations Definition" (the "Commission Agreements") printed on Surety One's letterhead and signed by the "bond applicant." These agreements were signed in June 2012, May 2013, and May 2017. The agreements generally provide that a producer, such as Surety One, *may receive* one or more of certain commissions or fees, depending on the producer's relationship with the surety. The agreements provide in consistent language the following regarding the types of commissions a producer, such as Surety One, might receive:[3]

> **Base Commission**. Producers are generally paid a Base Commission for the sale and service of policies. Base Commission is a fixed percentage of the policy premium or a fixed amount per policy set prior to the sale (effective date) of the policy to which it applies. The percentage or amount may vary depending on certain factors, such as the type of product, the risk classification, whether the policy is new or a renewal, whether another policy is written for the same insured, and

---

[3] This excerpt is from the agreement signed in May 2012, but all three agreements contain substantially similar language.

the services provided to the policyholder. In some cases, the percentage or amount may be negotiated on a transaction by transaction basis, and may vary by Producer based, at least in part, on the Producer's past performance and the expected value of the Producer's business going forward.

**Supplemental Commission**. Certain Producers may be eligible for Supplemental Commission in addition to Base Commission. Like Base Commission, Supplemental Commission is a fixed percent of premium or a fixed amount per policy, which is set prior to the sale of the policy to which it applies. Eligibility for, and the amount of, Supplemental Commission paid on current business is based on a Producer's ability to meet certain past production, growth, profitabill or other historical performance objectives established by the surety(ies). Supplemental Commission is generally paid separately from Base Commission on an annual or other periodic basis.

**Contingent Commission**. Certain Producers may be eligible for Contingent Commission, which is generally offered in lieu of Supplemental Commission. Contingent Commission is generally a particular percent of the premium written during a preceding performance period or a particular sum that is based upon a Producer's ability to meet certain production, growth, profitability or other performance objectives established for us that preceding period. As such, eligibility for, and the amount of Contingent Commission cannot be determined until after the sale of bonds that occur over a given period of time. Contingent Commission is generally paid separately from Base Commission on an annual or other periodic basis. Contingent Commission is not offered for all products and lines of business. By executing this document you specially acknowledge your understanding that we enter into such contingency arrangements.

The agreements also described a "Producer Administrative Fee," which may be charged by producers to their customers "related to services they provide to their customers." These administrative fees would not be part of the surety's premium, would not be charged on the surety's behalf, and could be in addition to any compensation the producer receives from the surety. Finally, all three agreements provide, above the signature line, "I understand that ALL premiums, commissions,

and fees have been combined into my quote and I do consent to that/those fees as quoted." No "quotes" are contained in the record.

Three witnesses testified at the contested case hearing. The first was Andrew Smith, who is responsible for fraud investigations and reporting at Lexon.[4] According to Smith, Lexon revoked appellants' authority to produce new business in October 2014; Lexon continued to service existing bonds and policies, but appellants could not work on new Lexon business. Lexon terminated its relationship with appellants in 2017 after it discovered the "overbillings" charged to MCSWA. Lexon filed a fraud report on January 27, 2017.

Smith explained that Lexon discovered that appellants were charging MCSWA more than Lexon billed for the bond premium when Lexon's operations department had difficulty collecting Lexon's premium from appellants for the 2016-2017 bond renewal year. According to Smith, appellants did not respond to Lexon's communications, so Lexon contacted MCSWA directly to determine whether it had been billed for the bond renewal. MCSWA informed Lexon that it paid the premium to appellants a few months earlier, and Lexon requested invoices and proof of payment. Smith testified that, after receiving the invoices, Lexon discovered that appellants were charging MCSWA an amount significantly above Lexon's bond premium, which led Smith to investigate further. He confirmed that similar "overbilling" had occurred each policy term since the bond's inception.

Smith sent a letter to appellants demanding that they refund to MCSWA the "overbilled" amounts within seven calendar days of receipt of the letter. Poindexter responded via email, stating he had legal counsel that would address the concerns

---

[4] Appellants repeatedly refer to Lexon as a "competitor," but do not direct us to any supporting evidence in our record for this assertion. At all relevant times, appellants were acting as Lexon's general agent to produce surety bonds.

7

and would keep Lexon apprised of the process. Poindexter also stated in the email that he had "strict written approval from Maverick to bill and collect every dollar that has ever been invoiced to them." Poindexter, however, did not follow up with Lexon regarding the demand or the "overbillings," did not provide Lexon with any explanation for the charges, and did not provide Lexon with copies of written consent from MCSWA authorizing the charges.

On cross-examination, Smith acknowledged that MCSWA never demanded that Lexon refund any amounts. He testified that he thought Lexon should refund the "overages" to MCSWA,[5] but Lexon did not do so because Lexon determined there could have been some other contractual relationship between appellants and MCSWA authorizing the premium differentials. According to Smith, the "fraud" in this case is that appellants referred to amounts they collected from MCSWA as "premiums," when the premiums were actually the lesser amounts for which Lexon invoiced appellants and appellants paid to Lexon. Smith testified that MCSWA did not appear to be aware that appellants were charging it more than the bond premiums, although he acknowledged that he did not speak with anyone at MCSWA to confirm what Rodriguez or appellants disclosed to the MCSWA board.

Rodriguez and Poindexter testified for appellants. According to Rodriguez, he was the agent responsible for this bond, and he had no knowledge that appellants communicated directly with MCSWA at any time. He explained that several insurers denied his request for a surety bond because members of the county commissioner's court (not the MCSWA board) had been indicted recently for embezzlement and kick-back schemes. Despite concerns with ongoing investigations into Maverick County, however, appellants, at Rodriguez's request,

_____

[5] It is undisputed that appellants, not Lexon, collected the "overages."

8

were able to secure a bond through Lexon in 2012. Rodriguez testified that MCSWA was aware of the charges in excess of the Lexon premiums because Poindexter had informed Rodriguez of this arrangement, and Rodriguez informed the MCSWA landfill manager. Rodriguez explained that the Commission Agreement was executed by the MCSWA board before the bond was issued in June 2012. He testified that he described the fees that appellants would charge MCSWA to MCSWA's manager and the board based on this document. According to Rodriguez, at board meetings at which he was present, the MCSWA board declined to solicit other insurers to take over the bond after 2016 because appellants were "there for them" when no one else would provide bond coverage. He stated that he specifically disclosed "the fees" each year to MCSWA, but he acknowledged that he did not have a separate document or invoice detailing the amounts of any additional fees or commissions above the Lexon premium that appellants would be charging MCSWA. Rodriguez believed that the Commission Agreement was a disclosure of fees that might be charged. To Rodriguez's knowledge, MCSWA had not filed a complaint with the Department regarding appellants' fees, nor had MCSWA sought a refund for any "overbillings." Rodriguez testified that he received a $20,000 annual commission from appellants related to this bond each year. He also billed MCSWA $5,000 per year for his services related to the bond.

Poindexter testified that he is a licensed insurance agent in all fifty of the United States, Canada, Puerto Rico, and the U.S. Virgin Islands. According to Poindexter, he assisted Rodriguez in obtaining the surety bond. He conceded that the amounts Smith and the Department provided were accurate, but he insisted that the "overage" was a "fee" to MCSWA in addition to Lexon's premium. Thus, for example, he agreed that his 2012 "fee" over and above his commission was $42,878.70, as reflected in the final column in the table above. Poindexter testified

9

that he earned this fee because of the services he provided and the difficulty in placing the bond due to Maverick County's poor financial condition and the recent criminal indictments and investigations. These factors made placement of the bond "more risky" from an insurer's perspective. According to Poindexter, it took him about four months, working a couple hours a day, to initially place the MCSWA surety bond. He also explained that renewing the bond annually entailed significant work, including background research and due diligence, as well as dealing with any changes at MCSWA or requested by TCEQ. Poindexter worked closely with Rodriguez, who, as appellants' liaison, attended hearings and board meetings and reported to Poindexter regarding any issues or questions. According to Poindexter, Rodriguez disclosed the specific items within the annual invoice to MCSWA during Rodriguez's meetings with MCSWA and the Maverick County Commissioner's Court.

Poindexter addressed the Commission Agreements in some detail. He stated that he provided MCSWA a copy of the agreement every year the bond was renewed, and MCSWA was "fully aware" of the fees appellants charged in addition to Lexon's premium. In Poindexter's view, this document disclosed that he was being reimbursed by an insurance company as required by the Insurance Code. He conceded, however, that the invoices he sent to MCSWA did not separately detail the fees or premiums, and instead reflected a single, aggregate amount due, which included the premium. He also stated that Surety One no longer has a complete set of files due to incidents like Hurricane Maria, which "wiped out" his offices in Puerto Rico.[6] He acknowledged that there were no more specific invoices detailing

---

[6] According to its letterhead and invoices, Surety One's address is in North Carolina, not Puerto Rico.

10

the fees charged to MCSWA. He also testified that the Department had not asked him to return the "overbillings" to MCSWA.

After the contested case hearing, the ALJ submitted his PFD, recommending that the Department revoke appellants' insurance agent licenses. The Commissioner adopted the following findings of fact and conclusions of law and incorporated them into the order revoking appellants' general lines agent and agency licenses:

### III. FINDINGS OF FACT

1. Carlyle T. Poindexter (Poindexter) holds a general lines agent license with a property and casualty qualification originally issued by the Texas Department of Insurance (Department) on July 10, 2003.

2. Surety One, Inc. (Surety One) holds a general lines agent license with a property and casualty qualification originally issued by the Department on November 9, 2012. Poindexter is the officer/director of Surety One.

3. Poindexter and Associates, Inc. (Poindexter and Associates) holds a general lines agent license with a property and casualty qualification originally issued by the Department on March 30, 2004. Poindexter is the officer/director of Poindexter and Associates.

4. Poindexter, Surety One, and Poindexter and Associates are, collectively, the Respondents in this case.

5. Poindexter was individually appointed as an agent by Lexon Insurance Company (Lexon) from October 2011 through July 2017. Lexon revoked Poindexter's ability to write new surety bonds on July 2, 2014, but continued to renew the existing business he had previously placed until Lexon terminated their relationship in July of 2017.

6. In 2012, the Maverick County Solid Waste Authority (MCSWA) sought a surety bond (bond) to meet the financial assurance requirements of its permit to operate and ultimately close a solid waste landfill issued by the Texas Commission on Environmental Quality (TCEQ).

7. MCSWA engaged a local insurance agency, LaVernia Insurance Agency (LaVernia) and its independent insurance agent, Jose Jaime Rodriguez, to assist in obtaining the bond. Mr. Rodriguez contacted Respondents to locate an insurance agency that would be willing to issue the bond.[7]

8. After rejections from a number of insurance agencies, Respondents placed the bond with Lexon initially in the amount of $2,856,515.

9. The amount listed as the "bond premium" on the initial Performance Bond contract entered into between Respondents and MCSWA was $99,979.00, which was paid to Respondents on April 23, 2012, prior to the execution of the surety bond contract.

10. Respondents and the MCSWA Board President executed the bond contract on May 1, 2012, effective May 1, 2012.

11. During the six-year period at issue in this case—June 2012 through May 2018—the bond limit increased from $2.9 million to $3.8 million as additional sections of the landfill were opened.

12. On June 1, 2012, Respondents and Lexon executed an Agency Execution Report that memorialized the amount for the MCSWA bond as $45,704.24, plus an agent commission of $11,426.06 for a total of $57,1309.30.

13. The bond premium billed by Lexon to Respondents increased as the bond limit increased.

14. Lexon authorized Respondents to retain a 20% commission on the annual MCSWA bond premium.

15. Between 2012 and 2018, Respondents billed MCSWA at rates in excess of the premiums Respondents paid to Lexon as follows:

    a. For the 2012-2013 bond term, the premium due to Lexon was $57,130.30. Respondents billed MCSWA $99,979.00, meaning Respondents collected $42,848.70 more than Respondents paid to Lexon for this annual premium (not accounting for the commission retained by Respondents).

---

[7] The ALJ made a "non-substantive" revision to this finding pursuant to appellants' Brief on Exceptions to the PFD, changing the phrase "local insurance *company*" to "local insurance *agency*."

b. For the 2013-2014 bond term, the premium due to Lexon was $58,920.00. Respondents billed MCSWA $93,302, meaning Respondents collected $34,382.00 more than Respondents paid to Lexon for this annual premium (not accounting for the commission retained by Respondents).

c. For the 2014-2015 bond term, the premium due to Lexon was $72,777.00. Respondents billed MCSWA $127,360.00, meaning Respondents collected $54,583.00 more than Respondents paid to Lexon for this annual premium (not accounting for the commission retained by Respondents).

d. For the 2015-2016 bond term, the premium due to Lexon was $73,796.00. Respondents billed MCSWA $129,145, meaning Respondents collected $55,349.00 more than Respondents paid to Lexon for the annual premium (not accounting for the commission retained by Respondents).

e. For the 2016-2017 bond term, the premium due to Lexon was $74,534.00. Respondents billed MCSWA $130,434.00, meaning Respondents collected $55,900.00 more than Respondents paid to Lexon for this annual premium (not accounting for the commission retained by Respondents).[8]

f. For the 2017-2018 bond term, the premium due to Lexon was $75,503.00. Respondents billed MCSWA $132,130.00, meaning Respondents collected $56,627.00 more than Respondents paid to Lexon for this annual premium (not accounting for the commission retained by Respondents.

16. Lexon filed a complaint with the Department in 2017 when it discovered that Respondents were charging MCSWA more than the bond premiums that Respondents were remitting to Lexon for the same bond.

17. No line items that described the services provided by Respondents in addition to a single amount due, referred to as a "Bond Premium" or a "Bond-MCSWA landfill renewal," were included on Respondents' annual invoices to MCSWA for this bond.

---

[8] The Department revised this finding of fact to correct the premium amount due to Lexon.

18. Respondents did not obtain a signed consent from MCSWA to charge fees in excess of the annual premiums Respondents paid to Lexon for the bond.

19. Respondents were not charging "fees" to MCSWA for costs incurred to obtain a motor vehicle record or a photograph of property.

20. The annual invoices through which Respondents requested payment for the amount they were charging to MCSWA were sent on Respondents' letterhead directly to the accounting department at MCSWA.

21. MCSWA remitted its payment for the bond directly to Respondents.

22. Respondents' sole contact with MCSWA prior to and during the time the bond was in effect was through Jose Jaime Rodriguez, an insurance agent not associated with Lexon who was retained by MCSWA to locate an insurer to place the bond.

23. Lexon was not aware that Respondents were paying a $20,000 per year commission to Mr. Rodriguez.

24. Mr. Rodriguez was also being paid a $5,000 per year commission from the MCSWA for this bond.

25. Respondents' commissions retained from Lexon were less than $20,000 in each year that the bond was in effect.

26. The Broker Commission Agreement (Commission Agreement) that Respondents provided to MCSWA lists various types of commissions or fees that Respondents "may" charge to MCSWA.

27. The Commission Agreement does not state that commissions or fees were being charged to MCSWA or list the amounts of any such commissions or fees.

28. The amounts that Respondents collected from MCSWA in excess of the premium amounts that Respondents remitted to Lexon were not fees.

29. The Commission Agreement was signed by a representative of MCSWA on at least one occasion.

30. The Commission Agreement does not reference Mr. Rodriguez.

31. MCSWA was not aware that Respondents were charging them an amount that was from 58% to 75% in excess of the premium stated on the bond filed with the Department.

32. Respondents were not acting as intermediaries between Lexon and Mr. Rodriguez.

33. Respondents were not acting as an intermediary between MCSWA and Mr. Rodriguez.

34. On November 27, 2019, [Department] Staff filed its First Amended Notice of Hearing against Respondents.

35. The First Amended Notice of Hearing stated a time, date, and location for the commencement of a mearing on the merits in this docket.

36. In addition to the time, date, and location, the First Amended Notice of Hearing contained a statement of the nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short, plain statement of the factual matters asserted or an attachment that incorporated by reference the factual matters asserted in the complaint or petition filed by the state agency. . . .

## IV. CONCLUSIONS OF LAW

1. The Department has jurisdiction over this matter. Tex. Ins. Code §§ 4001.002, .105, 4005.101, .102.

2. SOAH has authority to hear this matter and issue a proposal for decision with findings of fact and conclusions of law. Tex. Gov't Code ch. 2003; Tex. Ins. Code § 4005.104.

3. Respondents received timely and sufficient notice of the hearing. Tex. Gov't Code ch. 2001; Tex. Ins. Code § 4005.104(b).

4. An insurance license may be revoked if a licensee willfully violates a law of this state. Tex. Ins. Code § 4005.101(b)(1).

5. An insurance license may be revoked if a licensee misappropriates or converts to his own use money that belongs to an insured such as MCSWA. Tex. Ins. Code § 4005.101(b)(4)(C).

15

6. An insurance license may be revoked if a licensee engages in fraudulent or dishonest acts or practices. Tex. Ins. Code § 4005.101(b)(5).

7. Respondents violated Texas Insurance Code § 4005.101(b)(1), (4)(C), and (5) by collecting premiums from the policy holder—MCSWA—far in excess of the premiums Respondents remitted to Lexon for the same bond.

8. Respondents were not charging fees to MCSWA as the term fees is used in Texas Insurance Code §§ 4005.003 or 550.001(a).

9. Respondents received compensation from MCSWA but failed to obtain documented acknowledgement and disclosure from MCSWA showing that Respondents were also being compensated by Lexon. Tex. Ins. Code § 4005.004(b), (c).

10. An insurance agent who receives a commission for services as an agent may not receive an additional fee for those services provided to the same client unless the agent has made disclosures as required under Texas Insurance Code §§ 4005.003 or 4005.004. Tex. Ins. Code § 4005.054.

11. The Department should revoke Respondents' insurance agent licenses.

Appellants appealed the Commissioner's order to a Travis County district court. After briefing and a hearing by submission, the district court signed a final judgment affirming the order, denying appellants' administrative appeal, and dismissing with prejudice their claims. Appellant timely appealed to the Austin Court of Appeals, which transferred the case to this court.[9]

**Standards of Review**

The substantial-evidence standard of the Texas Administrative Procedure Act ("APA") governs our review of the Commissioner's order. *See* Tex. Gov't Code § 2001.174; Tex. Ins. Code § 36.201, .203. The APA authorizes reversal or remand

---

[9] *See* Tex. Gov't Code § 73.001. We are unaware of any conflict between Third Court of Appeals precedent and that of this court on any relevant issue. *See* Tex. R. App. P. 41.3.

16

of an agency's decision that prejudices the appellant's substantial rights because the administrative findings, inferences, conclusions, or decisions (1) violate a constitutional or statutory provision, (2) exceed the agency's statutory authority, (3) were made through unlawful procedure, (4) are affected by other error of law, or (5) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. Tex. Gov't Code § 2001.174(2)(A)-(D), (F). Otherwise, we may affirm the administrative decision if we are satisfied that "substantial evidence" exists to support it. *Id.* § 2001.174(1), (2)(E).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact." *Slay v. Texas Comm'n on Env't Quality*, 351 S.W.3d 532, 549 (Tex. App.—Austin 2011, pet. denied). We consider the reliable and probative evidence in the record as a whole when testing an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence. *Graff Chevrolet Co. v. Tex. Motor Vehicle Bd.*, 60 S.W.3d 154, 159 (Tex. App.—Austin 2001, pet. denied); *see* Tex. Gov't Code § 2001.174(2)(E).

Under this deferential standard, we presume that the Commissioner's order is supported by substantial evidence, and appellants bear the burden of proving otherwise. *See Dyer v. Tex. Comm'n on Env't Quality*, 646 S.W.3d 498, 514 (Tex. 2022) (quoting *Tex. Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 453 (Tex. 1984)). The burden is a heavy one—even a showing that the evidence preponderates against the agency's decision will not be enough to overcome it, if there is some reasonable basis in the record for the action taken by the agency. *Charter Med.-Dallas*, 665 S.W.2d at 452. We must uphold the agency's ultimate decision if the evidence "is such that reasonable minds could have reached

the conclusion that the agency must have reached in order to justify its action." *Dyer*, 646 S.W.3d at 514 (internal quotation omitted). Our ultimate concern is the reasonableness of the agency's order, not its correctness. *See Tex. Comm'n on Env't Quality v. Maverick County*, 642 S.W.3d 537, 544 (Tex. 2022). Even improper, superfluous findings will not support reversal when "an agency's decision is based on sufficient underlying findings that are supported by substantial evidence." *Dyer*, 646 S.W.3d at 514. An "improper, but superfluous, finding does not prejudice the substantial rights of the appellant." *Id.*

Although we apply substantial-evidence review to an agency's fact findings, we review an agency's legal conclusions de novo. *Scally v. Tex. State Bd. of Med. Exam'rs*, 351 S.W.3d 434, 441 (Tex. App.—Austin 2011, pet. denied). We also review questions of statutory construction de novo. *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). Our primary objective when construing a statute is to determine and effectuate the legislature's intent, and the "surest guide to what lawmakers intended is what they enacted." *Tex. Dep't of Ins. v. Am. Nat'l Ins. Co.*, 410 S.W.3d 843, 853 (Tex. 2012). When a statute is clear and unambiguous, we apply its words according to their common meaning to give effect to every word, clause, and sentence. *Id.* But if a statute's meaning is vague or ambiguous, we may defer to the agency's statutory interpretation unless it is plainly wrong or inconsistent with the statute's language. *Id.* Thus, when a statutory scheme is subject to multiple interpretations, we must uphold an enforcing agency's construction if it is reasonable and in harmony with the statute. *Tex. Citizens*, 336 S.W.3d at 629 (observing that "governmental agencies have a unique understanding of the statutes they administer" (internal quotations and citations omitted)).

**Discussion**

The Department may discipline a license holder if it determines that the license holder (individually or through an officer, director, or shareholder) has: (1) willfully violated a Texas insurance law; (2) misappropriated or converted to his or her use money belonging to an insured; or (3) engaged in fraudulent or dishonest acts or practices. *See* Tex. Ins. Code § 4005.101(b)(1), (4)(A), (5). The Commissioner revoked appellants' licenses after finding that they engaged in conduct proscribed by each of these three sections.

Among appellants' issues, they challenge the evidence supporting the Commissioner's order and the ALJ's interpretation of various Insurance Code provisions and contend that the order is arbitrary and capricious. To overturn the order, appellants must show that it prejudices their substantial rights. *See* Tex. Gov't Code § 2001.174(2). We conclude appellants have failed in their burden because substantial evidence supports the Commissioner's findings and conclusions that appellants willfully violated Insurance Code section 550.001(a), which the Commissioner correctly applied. *See* Tex. Ins. Code § 4005.101(b)(1). We also reject appellants' contention that the order is arbitrary and capricious. Because we conclude the order is supportable under section 4005.101(b)(1), it is unnecessary to address whether the Department also proved that appellants misappropriated or converted to their use money belonging to an insured (section 4005.101(b)(4)(C)) or engaged in fraudulent or dishonest acts or practices (section 4005.101(b)(5)). Tex. R. App. P. 47.1.

19

## A. Substantial Evidence Supports the Commissioner's Order

    1.    *Substantial evidence supports the findings that appellants violated section 550.001(a) by collecting payments not permitted by that statute.*

In connection with an application for insurance or the issuance of a policy, an insurer or an insurer's agent may collect only a premium and other specifically enumerated payments, including an agent fee. *See* Tex. Ins. Code § 550.001(a)(1), (5). The Commissioner found that appellants willfully violated section 550.001(a) by charging MCSWA well in excess of the premium set by Lexon. The "excess charges," the Commissioner found, "are not covered" under section 550.001(a) and were not "fees."

In their first and second issues, appellants say these findings are "contrary to the evidence" and are based on a legally erroneous reading of the code.

Their argument in support of issue one consists of recasting the relative weight of their evidence against the Department's. Essentially, appellants complain that the Commissioner afforded too much weight to the Department's evidence and too little to theirs. For example, they argue that: (1) Rodriguez's and Poindexter's testimony "was given little to no weight by the Order"; (2) their testimony was "credible"; (3) MCSWA's "satisfaction" with appellants' services warranted consideration; and (4) there was no substantial evidence showing that appellants engaged in "wrongful" or "dishonest" practices because their evidence was stronger than the Department's evidence.

"In a contested case hearing, the ALJ is the sole judge of witness credibility and is free to accept or reject testimony of any witness or even accept 'part of the testimony of one witness and disregard the remainder.'" *Granek v. Tex. State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778-79 (Tex. App.—Austin 2005, no pet.) (quoting *S. Union Gas Co. v. R.R. Comm'n*, 692 S.W.2d 137, 141-42 (Tex. App.—Austin

20

1985, writ ref'd n.r.e.)). In conducting a substantial-evidence review, we "may not substitute [our] judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion." Tex. Gov't Code § 2001.174(1); *Dyer*, 646 S.W.3d at 515. Appellants ask this court to do something it cannot: reweigh the evidence and reassess credibility determinations.

The second prong of their attack asserts that the Commissioner erroneously applied the Insurance Code. According to appellants, the Commissioner's findings constitute errors of law because the Commissioner considered only whether the "overbillings" were "service fees"—appellants agree they were not—but failed to consider the availability of "agent fees" under section 550.001(a). Appellants insist that the amounts they collected from MCSWA and did not remit to Lexon for premiums constituted "agent fees."

We disagree with appellants' reading of the PFD and the Commissioner's order. The ALJ expressly found that the "overbillings" did not qualify as any of the "policy support fees" permitted by section 550.001(a). In particular, the ALJ expressly stated that the excess premiums collected by appellants were not "agent fees." Similarly, the other specific findings of fact and conclusions of law did not distinguish between "service" or "agent" fees, but rather stated more broadly that appellants' excess collections over and above the Lexon premiums were not "fees" of any kind. Appellants are incorrect that the ALJ failed to consider whether the overbillings constituted "agent fees." The ALJ specifically considered that argument and rejected it.

Further, we believe that the ALJ's findings and conclusions adopted by the Commissioner are supported by substantial evidence. Appellants' documents, for example, notably characterize the full payment only as a "premium" and not as any type of "fee." While there was no invoice for the initial bond in 2012, a copy of the

21

performance bond itself, signed by MCSWA and Poindexter for Lexon, describes the bond amount—$99,979.00—only as "Bond Premium." The amount Lexon charged appellants for the premium, however, was $57,130.30. The bond neither discloses the lesser amount charged by Lexon as premium nor identifies any portion of the payment as fees. The bond renewal invoices likewise do not characterize any of the billed amounts as fees. They merely describe the lump sum as "Bond – MCSWA landfill renewal." They do not disclose that any fees are included in the billed amount.

Although section 550.001(a)(5) allows an agent to collect an "agent fee," that term is not defined in the code. Appellants say they charged an additional agent fee on top of the premium because MCSWA's applications required an inordinate amount of work due to its poor financial situation and credit. But the ALJ found more persuasive appellants' lack of documentation characterizing any part of the payments as fees or describing even nominally the nature of the agent services performed justifying the fees.

The Commissioner found and concluded that the amount billed by appellants in 2012 included amounts far in excess of the premiums appellants remitted to Lexon for the same bond and that the excess amounts appellants charged were not "fees" as that term is used in sections 4005.003 and 550.001(a). These findings and conclusions are supported by a reasonable factual and legal basis in the record. We hold there is a rational basis to conclude that appellants violated Insurance Code section 550.001(a) because the amounts appellants collected from MCSWA but did not remit to Lexon were overages that did not qualify as premiums, fees, or any other type of payment sanctioned in section 550.001(a). Appellants have not met their burden to overcome the presumption that the challenged fact findings regarding

22

section 550.001(a) are supported by substantial evidence. *See Dyer*, 646 S.W.3d at 514.

  2. *Substantial evidence supports the Commissioner's finding that appellants' violation was willful.*

We have concluded that the Commissioner's findings that appellants violated section 550.001(a) are supported by substantial evidence and not based on an erroneous reading of the Insurance Code. Appellants also challenge the Commissioner's findings that the violation was willful.

The Insurance Code does not define the word "willful." In other insurance-related contexts, however, the supreme court has construed the term to denote intentional conduct. *See Greer v. Franklin Life Ins. Co.*, 221 S.W.2d 857, 860 (Tex. 1949). In *Greer*, the court considered former article 21.23 of the Insurance Code, which called for forfeiture of a life insurance beneficiary's interest when the beneficiary is the "principal or an accomplice in willfully bringing about the death of the insured." *Id.*[10] In that context, the court thought it "entirely reasonable to interpret 'willfully' in the statute to mean the same as the common law test."[11] Similarly, Black's defines "willful" to mean voluntary and intentional, but not necessarily malicious. "Willful," Black's Law Dictionary (11th ed. 2019). "Intentional" means "[d]one with the aim of carrying out the act." "Intentional," Black's Law Dictionary (11th ed. 2019). These definitions are consistent with *Greer*'s construction of the term as used in the Insurance Code, albeit in a different context. Further, courts addressing whether a party willfully violated a statute have

---

[10] This provision is now codified at Insurance Code section 1103.151. *See* Tex. Ins. Code § 1103.151 ("A beneficiary of a life insurance policy or contract forfeits the beneficiary's interest in the policy or contract if the beneficiary is a principal or an accomplice in wilfully bringing about the death of the insured.").

[11] The court explained that the "common law" test was based on "intent and illegality as distinguished from malice." *See id.* at 859-60.

said that willful means that the party knows of the statute's prohibitions but violates the statute anyway. *See Mfrs. Auto Leasing, Inc. v. Autoflex Leasing, Inc.*, 139 S.W.3d 342, 346 (Tex. App.—Fort Worth 2004, pet. denied).

Intent is generally a fact question and may be shown by circumstantial evidence. *Churchill v. Mayo*, 224 S.W.3d 340, 345 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). "As a general rule, the intention with which an act is done can only be ascertained by circumstantial evidence. The inward objects and purposes of the mind, when in violation of moral or legal duty, are more frequently and truly indicated by circumstances, than by open and unequivocal acts or declarations." *Besch v. Besch*, 27 Tex. 390, 392 (Tex. 1864).

As explained by the ALJ, the preponderance of the evidence shows that MCSWA was not aware that appellants were remitting to Lexon only a fraction of the amounts they billed and collected from MCSWA as premiums and that appellants' actions appeared intended to ensure that MCSWA remained blind to this fact:

> In all but one year, this mark-up, not counting [appellants'] 20% retention from Lexon, was 75%. The record is starkly void of any documentation showing that either [appellants] or Mr. Rodriguez informed MCSWA that the annual invoices included a 75% markup. While Mr. Rodriguez may have told the MCSWA, or its landfill manager, or the Maverick County Commissioners Court, that this [performance] bond was hard to place and there may be extra "fees" that could be charged based on the Commission Agreement, the Commission Agreement is itself a generic document that does not list any specific fees, and repeatedly uses the term "may" to describe what could be assessed.
>
> These considerations indicate that [appellants] took actions to ensure that MCSWA was not aware of the premium that [appellants] paid to Lexon: there was no oral communication between [appellants] and MCSWA; Mr. Rodriguez was the sole contact with MCSWA; [appellants'] invoices do not provide any breakout of the additional

24

"fees" charged above Lexon['s] bond premium [that] flowed through to MCSWA; and there is no documentary evidence showing that MCSWA was made aware of the degree or existence of the additional charges.

Additionally, the difference between the amounts collected from MCSWA and those paid to Lexon as premiums is significant, and yet appellants never documented or explained to the customer that the disparity existed or why it was necessary or justified to bill MCSWA "premiums" well above the premiums charged by Lexon. Appellants continued this pattern of concealment for six years. Citing the Commission Agreements, appellants suggest that any statutory violation was not willful because those agreements disclosed potential fees in addition to premiums and because appellants "knew Mr. Rodriguez was explaining these fees to the MCSWA." Yet neither the Commission Agreements nor any invoice to MCSWA actually represented or disclosed any amount billed as "fees." And the ALJ was at liberty to reject appellants' assertion that Rodriguez informed MCSWA that appellants were in fact billing MCSWA a purported agent fee, given the lack of documentary support and the fact that no witness from MCSWA testified in support of the assertion. These circumstances support a finding that appellants knew they were not charging fees at all but instead were billing MCSWA for premiums far in excess of the amounts due Lexon, all of which provides further circumstantial support for the ALJ's findings that appellants' violation was willful. We agree with the ALJ that these facts "indicate that this lack of transparency was intentional and willful," and appellants have not met their burden to demonstrate otherwise.

The Commissioner's conclusion that appellants willfully violated the Insurance Code is supported by a reasonable basis and proper statutory construction of the relevant code provisions; thus, we conclude that appellants' substantial rights have not been prejudiced. *See* Tex. Gov't Code § 2001.174(2).

We overrule appellants' first and second issues. Our resolution of these issues renders it unnecessary to address appellants third, fourth, fifth, sixth, or seventh issues in which they challenge the order on other grounds. *See* Tex. R. App. P. 47.1; Tex. Ins. Code §§ 4005.101, .102; *Dyer*, 646 S.W.3d at 514 (as long as agency's decision is based on findings that are supported by substantial evidence, unnecessary findings, even if improper, cannot render the decision reversible).

## B.     The Order Is Not Arbitrary or Capricious

In issue eight, appellants contend the order is "arbitrary or capricious, characterized by an abuse of discretion, and demonstrates a clearly unwarranted exercise of discretion." We disagree.

Instances may arise in which the agency's action is supported by substantial evidence, but is nonetheless arbitrary and capricious. *See Charter Med.-Dallas*, 665 S.W.2d at 454. An agency acts arbitrarily if it makes a decision without regard for the facts, if it relies on fact findings that are not supported by any evidence, or if there does not appear to be a rational connection between the facts and the decision. *See City of Waco v. Tex. Comm'n on Env't Quality*, 346 S.W.3d 781, 819-20 (Tex. App.—Austin 2011, pet. denied). In other words, we must remand for arbitrariness if we conclude that the agency has not "genuinely engaged in reasoned decision-making." *Id.* (internal quotations omitted). However, an agency's order is not arbitrary and capricious simply because the decision maker did not accept evidence favorable to a particular party. *See Gulf States Utils. Co. v. Pub. Util. Comm'n of Tex.*, 841 S.W.2d 459, 475 (Tex. App.—Austin 1992, writ denied). To be arbitrary and capricious an order based on substantial evidence "'must be based on a violation of due process or some other unfair or unreasonable conduct that shocks the conscience.'" *Tex. Comm'n on Env't Quality v. Friends of Dry Comal Creek*, No. 03-21-00204-CV, —S.W.3d—, 2022 WL 4540955, at *6 (Tex. App.—Austin Sept.

29, 2022, no pet. h.) (quoting *Santulli v. Tex. Bd. of L. Exam'rs*, No. 03-06-00392-CV, 2009 WL 961568, at *4 n.5 (Tex. App.—Austin Apr. 10, 2009, pet. denied) (mem. op.)).

Appellants' eighth issue again asks this court to impermissibly reweigh the evidence. That the Commissioner did not accept evidence favorable to appellants simply does not make the order arbitrary or capricious. *See Gulf States Utils.*, 841 S.W.2d at 475.

The only new argument raised by appellants in this section of their brief is that the Commissioner erroneously adopted a "reasonable person standard" when it analyzed whether the Insurance Code's disclosure provisions were satisfied. However, neither the order nor the PFD analyzed the Insurance Code using a reasonable person standard, nor are any legal conclusions based on this standard. Appellants' argument does not show that the order is based on a violation of due process or involves unfair or unreasonable conduct that shocks the conscience. *E.g.*, *Friends of Dry Comal Creek*, 2022 WL 4540955, at *6.

Appellants have not established that the Commissioner's decision to revoke their licenses relied on fact findings that are not supported by any evidence, or that there is no rational connection between the facts and the decision, *see City of Waco*, 346 S.W.3d at 819-20, or that the order is based on unfair or unreasonable conduct that shocks the conscience. *See Friends of Dry Comal Creek*, 2022 WL 4540955, at *6. For those reasons, we overrule appellants' eighth issue.

**Conclusion**

We have overruled the dispositive issues in this appeal. Accordingly, we affirm the trial court's judgment.


/s/    Kevin Jewell
         Justice

Panel consists of Justices Wise, Jewell, and Poissant.